JACK TRUGMAN, PLAINTIFF-RESPONDENT, v. HARRY REICHENSTEIN, CITY CLERK OF THE CITY OF NEWARK, A MUNICIPAL CORPORATION, JOHN A. BRADY, JAMES T. CALLAGHAN, RAYMOND V. SANTORO, AND ESSEX COUNTY BOARD OF CANVASSERS, DEFENDANTS, AND MICHAEL A. BONTEMPO, DEFENDANT-APPELLANT.

Argued June 3, 1958—Decided June 5, 1958—
Opinion Filed June 9, 1958.

*Mr. Samuel H. Nelson* argued the cause for plaintiff-respondent.

*Mr. William A. Consodine* argued the cause for defendant-appellant.

The opinion of the court was delivered by

WEINTRAUB, C. J. On May 13, 1958 the City of Newark held its regular municipal election to choose a mayor, a ward councilman in each of its five wards, and four councilmen at large. The city is governed by Mayor-Council Plan C of the Faulkner Act. *N. J. S. A.* 40:69A–55 to 40:69A–60.

Ten candidates contended for the four offices of councilmen at large. The city clerk concluded that the four candidates who received the greatest number of votes were elected and the board of canvassers made the same determination. Plaintiff, who ran fifth, brought this action to compel a run-off election. The Law Division agreed with the city clerk and board of canvassers. The Appellate Division reversed, 50 *N. J. Super.* 377 (1958), and defendant Michael A. Bontempo, who finished first, petitioned for certification. In view of the imminence of the date for the run-off election, we directed immediate argument on the merits, subject to a later determination as to whether the appeal should be considered allowed. The cause was argued accordingly.

The issue has not heretofore been considered by this court, and being a substantial one, certification is granted. We proceed to the merits.

A total of 106,125 registered voters participated in the municipal election. The total of the votes for the ten candidates for councilmen at large was 300,572. Voting machines having been used, there is no way to determine how many actually voted for one or more of these candidates.

*N. J. S. A.* 40:69A–160 deals with the determination of the winners in the initial election. It reads:

"At the *regular municipal election* in any municipality which has adopted articles 4 or 5, or 9 through 12, inclusive, of this act,

the candidates receiving the greatest number and a majority of votes cast shall be elected to the respective offices; provided, however, that if:

(a) five councilmen at large are to be elected and 2 or more candidates for said office receive a majority of the *votes cast in the election*, the 5 candidates receiving the greatest number of votes shall be elected; or

(b) four councilmen at large are to be elected and 2 or more candidates for said office receive a majority of the *votes cast in the election*, the 4 candidates receiving the greatest number of votes shall be elected; or

(c) three councilmen at large are to be elected and 1 or more candidates for said office receive a majority of the *votes cast in the election*, the 3 candidates receiving the greatest number of votes shall be elected; or

(d) two councilmen at large are to be elected and 1 or more candidates for said office receive a majority of the *votes cast in the election*, the 2 candidates receiving the greatest number of votes shall be elected." (italics added)

*N. J. S. A.* 40:69A–161 deals with the run-off election and provides:

"In any regular municipal election referred to in section 17–11,[1] *if a sufficient number of candidates do not receive a majority of the votes cast to elect the required number of councilmen at large, or no candidate for mayor or no candidate for ward councilman receives a majority of the votes cast for his respective office,* a run-off election in the municipality or ward, as the case may be, shall be held on the fifth Tuesday next following such municipal election. The candidates for councilmen at large not elected at such municipal election, equal in number to twice the number of councilmen at large remaining to be elected, who received the greatest number of votes at such municipal election and the two candidates for mayor or for ward councilman who received the greatest number of votes at such election, shall be the candidates for the office for which they were nominated, at such run-off election. Military service ballots shall forthwith be printed and distributed for the run-off election in the same manner, so far as possible, as for other municipal elections. [Italics added.]

The candidate or candidates who receive the greatest number of votes at such run-off election shall be elected to the office or offices to be filled. If two or more candidates shall be equal and greatest in votes, for any of the purposes of this section, they shall draw lots to determine which one shall enter the run-off election or be elected therein, as the case may be."

---

[1] *N. J. S. A.* 40:69A–160.

The Law Division found that three of the candidates received a majority of the votes cast within the meaning of section 160, and since subsection (b) provides that if two candidates shall so fare, the four receiving the greatest number of votes are elected, they were deemed to have been so elected. That result was reached by dividing the total of 300,572 by four (the number to be elected), resulting in 75,143 as the number of "votes cast." The untenable assumption of fact upon which the calculation rests is that only 75,143 of the total voters, 106,125, chose to vote for councilmen at large, each voter expressing a preference for four candidates. Three candidates in fact polled more than a majority of 75,143.

▉▉ The Appellate Division, however, read the statute to mean that two candidates had to receive more than a majority measured in terms of the number of voters who participated in the municipal election, i. e., 106,125. On that basis, none of the candidates succeeded. We agree with the Appellate Division's conclusion.

If we look solely at section 160, which deals with the determination of the victors at the initial election, the problem seems relatively uncomplicated. That section in its enacting clause provides that "At the regular municipal election * * * the candidates receiving the greatest number and a majority of votes cast shall be elected to the respective offices." At this juncture, it may be noted that as to contests in which but one is to be elected, the quoted portion presents no difficulty. The total of votes for all candidates represents the total of voters participating in the election for that office and hence a majority of that total is a decisive expression of the popular will. What would constitute "a majority of the votes cast" where the voter may express multiple choices may be thought uncertain at that juncture, but light is shed in the four provisos. All of the provisos express the purpose to end the election process if a specified number of the total to be selected should receive "a majority of the votes cast *in the election.*" The word "election" refers to "the regular municipal election"

in the first line of section 160, and accordingly the reference is to the number of voters who participated in "the regular municipal election," that is, 106,125. This is consonant with common parlance in which each voter is said to have one vote in an election, albeit that he may have multiple choices and indeed vote with respect to a number of offices and issues.

The ambiguity arises, if at all, in section 161, the run-off provision. There we find that as to offices for which only one is to be chosen, that is, mayor and ward councilman, the majority is "a majority of the votes cast for his respective office." This is consistent with the language "a majority of votes cast shall be elected to the respective office" in the opening portion of section 160, and indicates or emphasizes that as to mayor and ward councilman, section 160 requires a majority of the total votes cast with respect to the specific office, as distinguished from the total number of voters who went to the polls—usually a larger number. As we have said, there is no difficulty in ascertaining the number who participated in the selection of a mayor or ward councilman, because the total received by all candidates for the specific office provides the answer.

Appellant argues that the explicit treatment of the contests for mayor and ward councilman evinces a legislative purpose that a candidate shall succeed if he obtains the vote of a majority of those who chose to vote with respect to that office. With this we agree. But the difficulty is that where, as here, four councilmen at large are to be selected, there is no way to determine how many in fact vote for councilmen at large when voting machines are used. In view of the widespread use of machines, the draftsman had to select an approach which would assure election only if the candidate did receive the approval of a majority who evidenced interest in that contest. He knew, as anyone conversant with municipal elections must know, that where there are multiple choices, "bullet" voting is commonplace. Hence it would not do to total the votes for all candidates and divide by the number to be chosen. The result would

not reflect the number of voters who actually sought a voice in their selection. It is true, of course, that the number who enter the booth is usually greater than the number who vote for councilmen at large, but between the possible choices, the number who enter the booth is the preferable one if the objective is to assure an election by not less than a majority of the voters who balloted for councilmen at large. Accordingly the draftsman employed "a majority of the votes cast in the election" in the case of councilmen at large, in contrast to "a majority of the votes cast for his respective office" in the case of mayor and ward councilman.

It should be noted that nowhere does the statute speak of "a majority of the votes cast for councilmen at large." Without some such expression, there can be no possible footing for appellant's claim. Appellant, however, seeks to find an expression to that effect in the following language of section 161:

"if a sufficient number of candidates do not receive a majority of the votes cast to elect the required number of councilmen at large."

We should bear in mind that section 160 deals with determination of the winners in the initial election, whereas section 161 comes into play only if the election has not been concluded under section 160. Hence section 161 should be reconciled with section 160 if at all possible, rather than be construed to dispute the sense of section 160. We find no conflict. The phrase of section 161 quoted above in this paragraph was inserted solely because under the provisos of section 160 less than the number of candidates to be elected may carry in the required total to be elected if they poll "a majority of the votes cast in the election." Thus under subsection (b) of section 160, where the required number of councilmen at large is four, the success of two under that subsection terminates the election. The success of one however would not, and hence the need for and sole purpose of the quoted phrase in section 161. Thus nothing in section 161 may be deemed to amend the controlling standard of election in section 160 (b), "a majority of the votes cast *in the election.*"

Appellant's interpretation seems to rest upon a misreading of the phrase quoted above from section 161 and which we repeat for convenience:

"if a sufficient number of candidates do not receive a majority of the *votes cast to elect the required number of* councilmen at large."

Appellant apparently reads the italicized words to describe the number of votes to be considered in determining "a majority" and would construe them to mean "votes cast for." The word "to" is not thus associated with "votes cast." On the contrary, it ties in with "sufficient number" and is used in the sense of "in order to." Thus the phrase refers back to the provisos of section 160 and should be read to mean (we interpolate clarifying words):

"if a sufficient number of candidates do not receive a majority of the votes cast [in order] to elect the required number of councilmen at large [under the provisions of section 160]."

If the quoted phrase were read, as appellant suggests, to set up a standard for victory contrary to the standard of section 160, the literal meaning would be that no one could succeed in the initial election unless he achieved "a majority of the votes cast" for all candidates for councilmen at large, here, a majority of 300,572. All agree that such literal interpretation would be preposterous. Appellant accordingly is driven to suggest that we insert a provision for the division of the total preferences indicated, 300,572, by the number to be elected. If any such thought were in the draftsman's mind, it is inconceivable that he would not have spelled out that formula. The answer is that the quoted phrase was not intended in any wise to override the provision of section 160, that the majority be "of the votes cast in the election." To insert the proposed formula would be to permit the election of candidates for councilmen at large by less than a majority of the voters who evidenced their interest in the contest for those offices. In short, the formula which appellant urges we should interpolate to further the legislative purpose would in fact defeat it.

*Anthony v. Rea,* 22 *N. J. Super.* 452 (*App. Div.* 1952) is not inconsistent with the views we have expressed. There the statute authorized a local referendum with respect to sale of álcoholic beverages on Sunday upon the filing of a petition "by at least fifteen per centum (15%) of the qualified voters of any municipality as evidenced by the total number of votes cast for members of the General Assembly, at the then next preceding general election held for the election of all of the members of the General Assembly, in such municipality." *N. J. S. A.* 33:1–47. There were 6,957 registered voters of whom 4,288 voted. Three assemblymen were to be elected, and the total of the votes for the seven candidates was 12,061. The signatures on the petition exceeded 30% of those who had voted and 19% of the registered voters. The contention, properly rejected, was that the statute required 15% of the total of all votes cast for the seven candidates. The court added that the total of such votes should be divided by the number of assemblymen to be chosen to arrive at the figure to which the percentage was applicable. It will be noted that the statute there spoke of "the total number of votes cast for members of the General Assembly," referring to the specific offices, whereas here, as we have pointed out, the reference is to "votes cast in the election" rather than "votes cast for councilmen at large." The total context of a statute must be viewed in seeking the legislative intent. Here "votes cast in the election" is contrasted with "votes cast for his respective office." The decisive consideration is that we are here dealing with election to public office and construing a statute in which there is evidenced a purpose that success shall depend upon the will of a majority who voted for the candidates, a purpose which would be frustrated by the proposed construction.

It may be added that if a doubt lingered, it should be resolved in favor of plaintiff's position. The Legislature sought to insure a decisive verdict at the polls. Hence the provision for a run-off. If we were uncertain as to the legislative will, we should lean to a construction which would

guarantee that we are not requiring less than the Legislature intended.

We cannot accept the suggestion that the Legislature sought to discourage "bullet" voting and hence we should find the formula proposed. We fail to understand how the formula would discourage such voting; the "bullet" voter would still be interested in his candidate or candidates alone, and the cause of the beneficiaries of such voting could be equally advanced under appellant's interpretation of the statute. And if such were the purpose of the Legislature, it would seek a solution addressed directly to "bullet" voting. We find nothing in the statute evidencing an intent to deal with that subject.

The judgment of the Appellate Division is accordingly affirmed.

WACHENFELD, J., votes to reverse the judgment for the reasons expressed in the opinion of Judge Waugh at the trial level.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, FRANCIS and PROCTOR—5.

*For reversal*—Justice WACHENFELD—1.