80 N.J. Super. 339 (1963)
193 A.2d 697
HUDSON COUNTY NATIONAL BANK, A NATIONAL BANKING ASSOCIATION, PLAINTIFF,
v.
THE PROVIDENT INSTITUTION FOR SAVINGS IN JERSEY CITY, A NEW JERSEY SAVINGS BANK, THE HOWARD SAVINGS INSTITUTION AND PLAINFIELD SAVINGS BANK, DEFENDANTS AND DEFENDANTS-INTERVENORS.
Superior Court of New Jersey, Chancery Division.
Decided September 9, 1963.
*341 Messrs. Milton, Keane & DeBona (Mr. John Milton, Jr. of counsel), attorneys for plaintiff.
Mr. Israel Spicer, attorney for amicus curiae New Jersey Bankers Association.
Messrs. Wilentz, Goldman & Spitzer (Mr. Frederick R. Becker of counsel), attorneys for defendant The Provident Institution for Savings in Jersey City.
Messrs. Pitney, Hardin & Kipp (Messrs. Roger C. Ward and William H. Osborne, Jr. of counsel), attorneys for defendants-intervenors The Howard Savings Institution and Plainfield Savings Bank.
Messrs. Darby & McDonough (Mr. Robert F. Darby of counsel), attorneys for amicus curiae Savings Bank Association.
PASHMAN, J.S.C.
Plaintiff The Hudson County National Bank, a national bank doing business in New Jersey, instituted this action against defendant The Provident Institution for Savings in Jersey City, a mutual savings bank, seeking to permanently enjoin and restrain Provident from offering or maintaining demand accounts subject to withdrawal by check by its depositors. In addition, plaintiff also sought an adjudication declaring the practice of maintaining demand accounts, engaged in by certain mutual savings banks, to be ultra vires *342 for all savings banks under the Banking Act of 1948, N.J.S.A. 17:9A-1 et seq.
Shortly after this action was commenced, defendant Provident was joined by The Howard Savings Institution and the Plainfield Savings Bank (defendants-intervenors), both mutual savings banks. The three "defendants" contended that the practice of the state mutual savings banks in maintaining demand accounts subject to withdrawal by check was and is "necessary and convenient" to the carrying out of the business of savings banks, and that the maintenance of demand accounts was a "usual custom" of savings banks. Defendants then pointed to the following sections of the Banking Act, arguing that the conclusion was inescapable that the defendants' practice of maintaining demand accounts was legislatively condoned:
"Every bank and savings bank shall, subject to the provisions of this act, have the following powers, whether or not such powers are specifically set forth in its certificate of incorporation:

* * * * * * * *
(12) to exercise all incidental powers, not specifically enumerated in this act, which shall be necessary or convenient to carry on the business of the bank or savings bank. * * *" (Emphasis added) N.J.S.A. 17:9A-24 (12)
"In addition to the powers specified in [17:9A-24], every savings bank shall, subject to the provisions of this act, have the following powers, whether or not such powers are specifically set forth in its certificate of incorporation:
(1) to receive money on deposit, to be repaid, upon such terms, not inconsistent with this act, as may be agreed upon between the depositor and the savings bank, according to the usual custom of savings banks." (Emphasis added) N.J.S.A. 17:9A-26(1).
Plaintiff, together with the New Jersey Bankers Association which filed a brief as amicus curiae, contended, inter alia, that the "necessary or convenient" clause of N.J.S.A. 17:9A-24(12) refers to incidental powers which do not include the maintenance of checking accounts and, therefore, the mere necessity or convenience for demand accounts cannot provide the justification for the savings banks' maintaining them. Additionally, plaintiff maintained that the practice of *343 the defendant and other savings banks in offering demand accounts to their customers was not a "usual custom" of savings banks, and that in any case a comprehensive study of the Banking Act discloses a manifest legislative intent to prohibit savings banks from providing demand deposits subject to withdrawal by check.
From an historical standpoint, defendant Provident, which received its charter in 1839 and commenced business in 1843, is the oldest mutual savings bank still in existence in this State. Only the Newark Savings Fund Association, which was incorporated in 1828 and which is no longer in business, is older than Provident in terms of initial legislative creation.
Two thirds of all mutual savings banks in the county and in the State of New Jersey were chartered between 1850 and 1880. The last charter to be issued in this State was to the Germania Association of Elizabeth in 1900 which, on July 31, 1947, converted from a savings association to a savings bank, taking the name of Elizabeth Savings Bank, which it bears today.
All of the parties agree that mutual savings banks, which are managed by a board of trustees and owned by their depositors, were originally designed to serve as a depository for the earnings and savings of the working people and to encourage thrift and conservation among the members of that class. As our highest court noted as recently as 1960 in the case of Application of Howard Savings Institution of Newark, 32 N.J. 29 (1960):
"A mutual savings bank is a different type of financial institution from a commercial bank. Its purpose has frequently been stated as encouragement of thrift by mutuality of ownership. It has no stockholders. The profits from its operations not retained for surplus are divided among its depositors in the form of percentage dividends periodically declared, popularly referred to as `interest.'" (32 N.J., at p. 39)
See also Commercial Trust Co. of N.J. v. Hudson Bd. of Taxation, 86 N.J.L. 424 (Sup. Ct. 1914), ("Savings banks are quite different from ordinary banks of discount and deposit, *344 and trust companies. They are engaged in a different business, not primarily for the making of money, but rather for the purpose of enabling people of small means to combine their small wages and by careful investments in restricted securities earn a moderate rate of interest. * * *"); and Mercantile National Bank of New York v. Mayor, etc., of the City of New York, 121 U.S. 138, 7 S.Ct. 826, 30 L.Ed. 895 (1887), ("No one can suppose for a moment that savings banks come into any possible competition with the national banks of the United States. They are, what their name indicates, banks of deposit for the accumulation of small savings belonging to the industrious and thrifty.").
Despite the relatively narrow nature of early mutual savings banks, the passage of the years has tended to change and broaden the banking services offered by these banks to their depositors. Indeed, the testimony of the various banking experts during the trial of this matter very clearly established that at the time of the Banking Act revision in 1948, six of this State's 24 mutual savings banks (Bloomfield Savings, Howard Savings, Hudson Savings, Montclair Savings, Plainfield Savings and United States Savings) maintained demand deposits of different types for their depositors in the following amounts:

 Name Number of Branches Amount (in thousands)
 Bloomfield Savings 1 $2,676
 Howard Savings 2 346
 Hudson City Savings 2 2,127
 Montclair Savings - 891
 Plainfield Savings - 217
 United States Savings - 112
 _____________________ ____ ______
Totals 6 main offices 5 branches $6,369

By 1960 the number of mutual savings banks with demand deposit liabilities increased to ten, as reflected in the following schedule:

*345
 Name Number of Branches[*]Amount (in thousands)
 Bloomfield Savings 2 $5,381
 Howard Savings 6 512
 Hudson City Savings 3 6,083
 Montclair Savings - 1,512
 Orange Savings - 167
 Plainfield Savings 1 1,149
 Provident Savings 3 198
 Somerville Savings - 134
 Union County Savings 1 204
 United States Savings 5 1,569
 _____________________ _____ _______
Totals 10 main offices 21 branches $16,909

To reiterate, in 1948 there were 24 mutual savings banks in New Jersey having an aggregate of seven branch offices. Of these 31 offices, 11 offered a checking account service of some nature. Of the 24 main banking institutions, six offered checking accounts, and of those six, three had one or more branches. Thus, 25% of the 24 savings banks offered this service and, with their branches, 35% of the total mutual savings bank facilities did so. The question remains, however, does this percentage support the conclusion that the maintenance of demand accounts subject to withdrawal by check was a "usual custom" of savings banks within the purview of N.J.S.A. 17:9A-26(1), supra?
The testimony of the expert witnesses for both sides did not, in my opinion, provide any conclusive basis upon which to resolve the main issue of "usual custom." As might be expected, plaintiff proposed that any activity having less than 50% bank participation could not be the basis for a usual custom. Plaintiff did feel, however, that 75% was a more realistic measuring rod for determining whether or not a banking practice was in accord with the statutory concept. Defendant, on the other hand, took a different approach, arguing that familiarity of the practice was the keynote; that *346 it was neither rare nor unique and that it was an appreciable and substantial characteristic of savings banks in this State. Defendant also maintained that the mere fact that a majority of savings banks did not provide checking accounts did not detract from its "customary" character, since this was merely a matter of personal choice and was not due to any assumed unlawfulness.
Neither plaintiff nor defendant offered any evidence tending to establish that the Legislature's use of the word "custom" in N.J.S.A. 17:9A-26(1) was made with a conscious knowledge that a numerical minority of mutual savings banks in this State maintained checking account services. Furthermore, to engage in supposition as to whether the Legislature considered the practice in the light of the several well-entrenched judicial definitions of "custom" is virtually impossible, if not unpermissive.
The utter absence of judicial precedent in this State, both prior and subsequent to the promulgation of the Banking Act, on the question of a custom's being given legislative recognition is a serious obstacle to any inquiry into legislative intent. The detailed discussion of Chief Justice (then Judge) Weintraub in Jantausch v. Borough of Verona, 41 N.J. Super. 89 (Law Div. 1956), affirmed 24 N.J. 326 (1957), was argued by both sides. The question there involved was whether beauty culture was a "customary" home occupation under a municipal zoning ordinance which permitted "home occupations incidental to * * * use as a residence," and is of little aid in the instant context if only for the reason that the Jantausch case must be considered in the light of its particular circumstances. Whether four out of ten beauty salons in a particular municipality, being located in a residential zone, makes such use "customary" has no bearing upon an inquiry as to whether the use of the words "usual custom" in N.J.S.A. 17:9A-26(1) encompasses the practice of savings banks in maintaining demand deposits subject to withdrawal by check. Even the apparent subordination of numerical prevalency in Jantausch, supra, 41 N.J. Super., at p. 100, does not, *347 of itself, support the proposition that the practice of 6 out of 24 (or 11 out of 31) savings bank facilities constitutes a "usual custom of savings banks."
On the other hand, the court does not feel that the absence of imposing proof tending to demonstrate the legality of a custom compels a negative conclusion as to its existence. The basic attributes of a custom are usually stated to be: (1) antiquity or duration, see, e.g., Albright v. Cortright, 64 N.J.L. 330 (E. & A. 1900); (2) general or universal character, see, e.g., City Electric Street R. Co. v. First Nat. Exch. Bank, 62 Ark. 33, 34 S.W. 89, 31 L.R.A. 535 (Sup. Ct. 1896); (3) certainty, continuity and uniformity, see, e.g., Federal Reserve Bank v. Malloy, 264 U.S. 160, 44 S.Ct. 296, 31 A.L.R. 1261 (1924); (4) reasonableness, see, e.g., Cowles v. Sgobel & Day, 105 Misc. 561 (Sup. Ct. 1919), 173 N.Y.S. 752; (5) legality, see, e.g., Allen v. St. Louis Nat. Bank, 120 U.S. 20, 7 S.Ct. 460, 30 L.Ed. 573 (1887); (6) harmony with public policy as defined by common law, by statute or by constitutional provision, see, e.g., Zimmern v. Southern R. Co., 209 Ala. 284, 96 So. 226, 29 A.L.R. 1237 (Sup. Ct. 1923); and (7) general acquiescence in the practice. See, generally, Unkovich v. N.Y. Central R.R., 128 N.J. Eq. 377, 380, 382 (Ch. 1934). In the vast majority of cases which have dealt with the legality of a supposed custom, the courts have considered the question in a context involving a change in a rule of law, be it contract or otherwise, which would apply ordinarily in the absence of the proffered custom. Even the few cases which deal directly with a statutory recognition or use of the word "custom" are confined to recognized practices in a narrow and limited context. See, e.g., Lichter v. Land Title Guarantee & Trust Co., 150 N.E.2d 53 (Ohio C.P. 1955), affirmed 150 N.E.2d 70 (Ohio Ct. App. 1957); Polich v. Anderson-Robinson Coal Co., 227 Iowa 553, 288 N.W. 650 (Sup. Ct. 1939); Millage v. Canton Twp., 73 S.D. 26, 38 N.W.2d 755 (Sup. Ct. 1949).
A comparison of the statutory law of our sister states, for the purpose of ascertaining the meaning of the term "usual *348 custom" as it is used in N.J.S.A. 17:9A-26(1), is not conclusive. Even if it be assumed, for purposes of analysis, that in using the phrase "according to the usual custom of savings banks" our Legislature meant savings banks throughout the United States (as plaintiff contends), scrutinization of the evidence offered by plaintiff reveals little in the way of interpretive aid. Plaintiff offered the official reports of the banking authorities of eight states which had, in 1948, mutual savings banks, and four states which prohibited their mutual savings banks from offering checking accounts. It also asked the court to take judicial notice of portions of the statutes of those 12 states, five others (including Alaska, which was not, of course, a state in 1948) and the United Kingdom.
Of the eight states in which the practice might be controlled by custom, three definitely condoned the practice (Indiana, Maryland and Vermont), one probably did so (Connecticut), three definitely did not do so (Delaware, Maine and New Hampshire), and one could not be definitely determined (Massachusetts). With no more than the bare statutory sections and official reports, the sketchy testimony and the absence of judicial interpretation, I believe it to be presumptuous to conclude that our Legislature consciously considered the practice of other jurisdictions when enacting the Banking Act of 1948, at least insofar as N.J.S.A. 17:9A-26(1) is concerned. There is no evidence, in any event, that the Legislature did so.
It appears inescapable that in order to ascertain what was meant by "usual custom," and particularly whether checking accounts were meant to be included therein, it is necessary to enlist the aid of certain recognized rules of statutory interpretation.
Initially, it is quite clear that the legislative intent is not to be fractionalized, and a statute which purports to encompass such a large and vital area as the business of banks and banking should be read as a whole with reference to the system of which it is a part. See, e.g., Alexander v. N.J. Power & Light Co., 21 N.J. 373 (1956). As our Supreme *349 Court recently said in Febbi v. Bd. of Review, Div. of Employment Security, 35 N.J. 601 (1961):
"It is a cardinal rule of statutory construction that the intention of the Legislature is to be derived from a view of the entire statute and that all sections must be read together in the light of the general intent of the act so that the auxiliary effect of each individual part of a section is made consistent with the whole. 2 Sutherland, Statutory Construction, 3d ed. 4812, §§ 4702, 4704 (1943); Trugman v. Reichenstein, 27 N.J. 280, 288 (1958); Petition of Sheffield Farms Co., 22 N.J. 548, 554 (1956).
When the Legislature has clearly defined a term, the courts are bound by that definition. 2 Sutherland, Statutory Construction, §§ 3002, 4814 (3d ed. 1943); Eagle Truck Transport, Inc. v. Board of Review, etc., 29 N.J. 280, 289 (1959)." (at p. 606)
See also Abrams v. Dept. of Civil Service of N.J., 70 N.J. Super. 559, 563 (App. Div. 1961); Walsh v. Dept. of Civil Service, 32 N.J. Super. 39, 48 (App. Div. 1954).
The Banking Act of 1948 is explicit on the payment of interest on deposits. As the plaintiff points out, banks have been given express authority to receive non-interest-bearing demand deposits. N.J.S.A. 17:9A-25(4). Nowhere in the act is there any such express power given to savings banks. They may receive money on deposit, to be repaid upon agreed terms, according to their usual custom. N.J.S.A. 17:9A-26(1). They may classify depositors according to their dealings and regulate payment of interest according to the classification. N.J.S.A. 17:9A-186(A)(2). It is true, as plaintiff argues, that there are no statutory sections dealing with savings banks which can be equated with the language found in N.J.S.A. 17:9A-25(4). Is the absence of such express language indicative of a legislative intent to deny savings banks the power now exercised by a minority? Furthermore, can the present practice be reconciled with the provision of the act which apparently compels savings banks to pay interest upon deposits so that, as nearly as possible, all profits are received by the depositors? See N.J.S.A. 17:9A-186(A) (1).
*350 If the Banking Act is to be read as a homogeneous whole, it would appear that the above provisions are inconsistent with the maintenance by savings banks of non-interest-bearing demand deposits. Absence of express statutory approval, in view of the other provisions noted by plaintiff, casts some serious doubt upon any assertion that the omission can be ascribed to mere oversight. The Banking Act of 1948 was the result of a comprehensive redrafting of the scope of commercial and savings bank activities. Detail and particularity are evident throughout.
On the other hand, the omission of an express provision is a two-edged sword. The directness with which the Legislature dealt with commercial bank practice as to non-interest-bearing demand deposits does not stand as authority for the proposition that savings banks could not do so. An affirmative authorization to commercial banks is not, per se, a negative prohibition against savings banks. Nowhere is there any express prohibition against maintenance by the latter of demand deposits. Quite the contrary. Various sections encompass savings banks in treating demand deposits. See, e.g., N.J.S.A. 17:9A-18, 19, 27, 28, 216 to 219. Similarly, the Bank Collection Code, N.J.S.A. 17:9A-230 to 246, which was repealed in 1961 and reinstated in large part by N.J.S.A. 12A:4-101 et seq. refers to savings banks (banking institutions) in connection with demand deposits. There is an absence, in the Banking Act of 1948 and its amendments, of any clear-cut distinction between banks and savings banks from which it can be accurately concluded that the Legislature clearly pronounced a prohibition against demand deposits, interest- or non-interest bearing, in savings banks.
Absent this language, the court, in construing the act, may properly utilize another very important interpretive aid, namely, legislative acquiescence in a long-standing administrative interpretation. See, e.g., In re Glen Rock, 25 N.J. 241, 250 (1957); 2 Sutherland, Statutory Construction (Harack, 3d ed.) § 5109, pp. 525-6. To apply this canon of construction, it is first necessary to review the history of the *351 savings bank practice in issue in the light of the treatment accorded it by the Department of Banking and Insurance, the agency whose responsibility it is to administer banking legislation and to regulate banking activities.
Apparently, the first savings bank to offer a checking account service in this State was Hudson City Savings Bank, which inaugurated the practice about the beginning of this century. By 1929 five other savings banks offered the service, some restricted to savings depositors only and some restricted to the amount which could be deposited. Varying rates of interest were paid.
In the latter part of 1928 the Deputy Commissioner of Banking and Insurance, Mr. Hilson, wrote to the president of the Bloomfield Savings Institution to inquire about a newspaper advertisement placed by that bank to the effect that a checking account service was being offered to its depositors. Mr. Hilson wanted to know "just where in the law it is provided that a savings bank is permitted to do a checking account business."
In reply, the president of Bloomfield Savings informed the Deputy Commissioner that several other savings banks had such accounts and that Bloomfield had acted upon legal advice which referred to those sections of the then existing Savings Bank Act which permitted classification of depositors and payment of deposits in accordance with regulations duly adopted by the bank's board of managers. No response to this reply was forthcoming from the Bureau of Banking.
In 1937 the then Deputy Commissioner, Mr. Compton, requested an opinion from the Attorney General's office "defining the right of savings banks to receive demand deposits subject to withdrawal by check." An Assistant Attorney General replied by letter that the statute, as he read it, did not empower savings banks to engage in the practice. Despite this opinion no action was taken by the Department to stop the practice. For the next 20 years, during which time the Banking Act of 1948 was enacted, the Department acquiesced in the practice.
*352 In 1958 the Hudson City Savings Bank sought permission to acquire, as an incident to a merger, the demand deposits of the North Bergen Trust Company. At that time the plaintiff's chairman, Mr. Ferguson, inquired of the Deputy Commissioner whether this acquisition was proper since it meant the acceptance by a savings bank of demand deposits subject to withdrawal by check.
The Department then instituted its own inquiry, seeking the opinion of the Attorney General's Office. That office submitted a memorandum opinion to the Deputy Commissioner which stated, in its essential part, that: (1) "it would not be unreasonable to conclude that the bank [Hudson City Savings] is empowered to accept demand deposits"; and that (2) "in view of the long standing administrative construction by the Department of Banking and Insurance the problem might be better resolved by an appropriate study directed to possible legislative changes rather than by legal ruling at this time." It was suggested that if an immediate legal ruling was desired, then the Commissioner should make a formal request for an opinion of the Attorney General. There is no evidence that any such formal opinion was requested.
The importance of the foregoing chronology is self-evident. In Bd. of Ed. of Manchester Tp. v. Raubinger, 78 N.J. Super. 90, 97 (App. Div. 1963), the court noted that a "longstanding statutory interpretation by an administrative agency is entitled to great weight * * *." In Lane v. Holderman, 23 N.J. 304 (1957), the court said "that resort may be had to long usage and practical interpretation in construing statutes to ascertain their meaning, to explain a doubtful phrase or to illuminate any obscurity." (23 N.J., at p. 322.) See also State Dept. of Civil Service v. Clark, 15 N.J. 334 (1954); Swede v. City of Clifton, 39 N.J. Super. 366 (App. Div. 1956), affirmed 22 N.J. 303 (1956).
In In re Glen Rock, 25 N.J. 241 (1957), the court held that an administrative agency's interpretation of its own powers and responsibilities, when long-standing, is entitled to great weight where the statutory provisions that it is called upon to administer are ambiguous, and especially where that *353 interpretation is, "inferentially at least, concurred in by the Legislature." (25 N.J., at p. 250.) See also Harper v. New Jersey Mfrs. Cas. Ins. Co., 1 N.J. 93, 98-99 (1948); Mayoros v. Board of Review, 49 N.J. Super. 74, 77 (App. Div. 1958); 2 Sutherland, Statutory Construction (3d ed. 1943), § 5109.
For a period of at least 20 years prior to the 1948 Banking Act the Department of Banking and Insurance knew of the demand deposit practice of certain savings banks. In the 12 years between that act and the institution of this suit the practice was still condoned.
The Legislature, both prior to 1948 and ever since that time, must be presumed to have known of the demand deposit practice since the annual reports of the Commissioner of Banking and Insurance included that information. Our Supreme Court has also noted the practice, albeit quite passively. In Application of Howard Savings Institution of Newark, supra, 32 N.J. 29, the court affirmed the Commissioner's approval of the establishment by Howard Savings of a branch office within the county where its main office was located. In scrutinizing the services to be offered the community in light of the statutory direction that establishment of a branch office be designed to serve to the advantage of the public interest, the court remarked that among the services offered by the new branch was that of personal checking accounts. (32 N.J., at p. 41.) Thus, at least inferentially, the Commissioner's approval of the establishment of the branch office and, consequently, his approval of Howard Savings' checking account service, were adopted by our Supreme Court.
Continued approval by the Commissioner of the maintenance by savings banks of demand deposits subject to withdrawal by check as a proper practice bespeaks a lack of power to disapprove. When, in 1929, Howard Savings merged with the Security Savings Bank it was agreed that interest was to be allowed on "accounts subject to check." The merger was approved by the Commissioner. In 1958, as noted earlier, the Commissioner approved the establishment by Hudson *354 City Savings Bank of a branch office as an incident of its acquisition of a trust company. The new branch was to be located in the main office of the trust company and included the assumption by Hudson of the Trust company's demand deposit liabilities and maintenance of checking accounts. The acquisition, transfer and branch office establishment was approved despite certain known objections to the assumption by Hudson of the demand deposit liabilities.
In July 1962, 14 years after the 1948 act and nearly two years after the institution of this suit, the Commissioner approved the establishment of a branch office by Provident with knowledge that it would offer the checking account service to its depositors.
The afore-mentioned events, combined with the long-standing administrative acquiescence, is at least tacit approval by the Department of Banking and Insurance of the demand deposit activity engaged in by some of the savings banks in this State. The Legislature's failure to make an express pronouncement in opposition to the Department's consistent approval thus takes on great significance. In Walsh v. Dept. of Civil Service, supra, the court held:
"The practical construction of the statute by the Commission over a period of years without interference by the Legislature is evidence of its conformity with the legislative intent and strongly inclines the courts to concurrence therein. * * *
The fact that the particular interpretation was adopted as part of the routine administration of the law rather than following a formal hearing in an adversary proceeding * * * does not prevent this concurrence." 32 N.J. Super., at pp. 48, 49.
There can be no doubt that the course of administrative treatment of the instant problem is heavily in favor of the validity of the practice. Both prior and subsequent to the 1948 act some savings banks provided checking account services, to the knowledge of the Commissioner and the Legislature. Neither took any contrary action.
There is no doubt that the various provisions of the 1948 act which have critical relevance to the main issue in this case are not so clear, precise and unambiguous as to *355 eliminate the propriety of investigating and considering administrative construction. See, e.g., Loveladies Property, etc. v. Barnegat City, etc., Co., 60 N.J. Super. 491, 504 (App. Div. 1960), certification denied 33 N.J. 118 (1960). Whether the practice is ultra vires the powers of savings banks is a question which the statute, on its face, does not expressly answer. This being so, the practical construction accorded the practice under the 1948 act which was substantially contemporaneous with the adoption thereof should be accorded great weight. See, e.g., North Central Counties Retail Liquor, etc. v. Edison Tp., 68 N.J. Super. 351, 359 (App. Div. 1961); Essex Co., etc., Stores Ass'n v. Newark Board of Alcoholic Beverage Control, 64 N.J. Super. 314, 322 (App. Div. 1960); Presbyterian Church, etc. v. Div. of Alcoholic Beverage Control, 53 N.J. Super. 271 (App. Div. 1958), certification denied 29 N.J. 137 (1959).
No formal directive has issued from the Commissioner concerning the particular practice. One of the latest official statements directly in point (and which was placed in evidence) was a letter from Acting Deputy Commissioner Prosser to Mr. Ferguson, chairman of the plaintiff, dated July 18, 1958, in which the latter was advised that the Department was going to "make a study of the situation" in regard to "the right of savings banks of New Jersey to accept demand deposits withdrawable by check." Whether that "study" was ever completed, no less initiated, does not appear. In December 1958 the question was still under advisement. Be that as it may, the Department's subsequent action in approving branch office establishments which provided checking account services and in promulgating savings bank statutory regulations which expressly recognized demand checking accounts, reveals no change in attitude. It should also be mentioned that in the latter part of 1958 a bill was introduced in the Senate to prohibit and abolish the checking account practice engaged in by mutual savings banks, but this bill was never acted upon for reasons not made known to the court.
*356 From a reading of the applicable statutory provisions and in light of well recognized canons of construction heretofore adverted to, this court concludes that under the Banking Act of 1948 savings banks in the State of New Jersey may accept demand deposits subject to withdrawal by check. While only a numerical minority of such banking institutions have engaged in the practice, this fact does not automatically remove it from consideration as a usual custom of savings banks. The evidence overwhelmingly demonstrated that the Department of Banking and Insurance knew of the practice, informed the Legislature of its existence, took no action to halt it and, in fact, approved it after careful consideration. Had the Legislature intended to prohibit the practice, it could and would have done so in express language either in the Banking Act of 1948 or by amendment thereafter.
The language of N.J.S.A. 17:9A-24(12) regarding the exercise by savings banks of "incidental powers," not specifically enumerated, which shall be "necessary or convenient" to the carrying on of business of a savings bank buttresses this conclusion. This section was, I believe, fully intended to be accorded a broad scope, especially in view of the more restrictive phraseology of its predecessor which referred only to "corporate powers necessary to the exercise of the powers" of a savings bank. R.S. 17:6-17(b) (repealed). Plaintiff's contention that the words "incidental powers" greatly limit the words "necessary or convenient," and that the additional powers must therefore be implemental or supplemental of specifically enumerated powers, is not, in my opinion, a correct interpretation. While I agree that the section cannot give independent vitality to a proscribed activity, however, the checking account practice is, in fact, incidental to the power of savings banks to maintain classes of depositors and to regulate interest according to each class within the rules laid down by the Commissioner. See N.J.S.A. 17:9A-186(A)(2).
So, too, the fact that no interest is paid on demand deposits does not violate the terms of N.J.S.A. 17:9A-186(A). *357 Had subsection (A)(1) so clearly compelled payment of interest on all deposits, there would have been no need for the various inquiries to and from the office of the Commissioner. The fact is that the subsection, when considered in light of subsection (A)(2) regarding classification of depositors, leaves a good degree of doubt on the question. This doubt has been resolved accordingly and need not be repeated.
Plaintiff has offered a technical argument based upon the effect which the maintenance by savings banks of demand deposits has or will have upon our economy. In its simplest form the argument starts with the premise that since national banks use their "free" reserves to stimulate credit financing, and savings banks cannot do so (due to the restriction on the type of investments which they may make), for every dollar deposited in a demand deposit in a savings bank, the economy is deprived of five dollars. Secondly, plaintiff contends that demand deposits are and will be diverted from commercial banks in small communities to savings banks and thus deprive local industry and business of the advantage of the commercial bank's lending power.
Defendants, in response, attacked the spectre of the economic day of doom indicated by plaintiff and offered statistics of their own. It is not necessary for the court to embark upon an evaluation of the conflicting statistics and theories offered. While the court is not expert in national monetary management in particular or economics in general, the portent of economic chaos presented by plaintiff has not occurred. In any event, the proper forum before which these economic theories should be offered is the legislative branch, not the judiciary.
Plaintiff has also criticized the fact that the various checking account services of the savings banks are not uniform and that some were "hermaphrodite arrangements" which were essentially time deposits subject to withdrawal by draft. While it is true that the regulations utilized by these banks vary in nature, such as to time of advance notice of withdrawal, limits on total monthly withdrawals, presentation of *358 a passbook, and restriction to established time depositors, these conditions were known to the Commissioner and were not objected to. Moreover, some have never been enforced. In short, each of the various services is, in essence, what can be accurately considered as "checking accounts," and the individual distinctions have no bearing upon the basic question of power to maintain the service  which I have determined in favor of defendants.
One final point should be mentioned although it was not raised by either side either in the pleadings, pretrial order, at trial or in the briefs. I refer to the question of whether, considering the role of the Commissioner of Banking and Insurance in relation to the Banking Act of 1948 in particular and the banking business in general, the institution of this suit was violative of the exhaustion of remedies doctrine and R.R. 4:88.
Throughout the course of this case repeated emphasis has been placed upon the role of the Commissioner and his Department, and especially their conduct in regard to various inquiries concerning the checking account practice of the savings banks. Plaintiff maintained that no construction of the Banking Act was taken by the Department; rather, that it was and still is preparing a study. Defendants contended, and I so found, that the Department had both tacitly and expressly condoned the practice through knowledge, acquiescence and failure to object. With the close and obvious relationship between the basic question and the Department, through the Commissioner, why does not the latter have jurisdiction over the issue, with appeal by any aggrieved party to be made in accordance with R.R. 4:88-8 and -10 and subject to R.R. 4:88-14? This question, it seems to me, is relevant to this case and should have been considered.
The Commissioner is vested with broad discretionary powers. For example, if he finds that a bank or savings bank is violating its certificate of incorporation or conducting its business in violation of any law of this State, or in an unsafe manner, he may order it to cease such practice, in *359 which case the violator may seek relief in the Superior Court. See N.J.S.A. 17:9A-267. The Commissioner may take possession of the property and business of any bank which violates his order, or is insolvent, or which, in his opinion, is in an unsound or unsafe condition to transact business. See N.J.S.A. 17:9A-269(A). With broad and drastic powers such as these, might not one expect the Commissioner to have jurisdiction over the question of whether the practice of savings banks in maintaining checking accounts subject to withdrawals by check is a violation of the Banking Act or an ultra vires activity? I believe that strong arguments may be made on both sides.
Since the question of exhaustion of remedies was not raised by the litigants, and since I have already determined the issues on their merits, the point is, for present purposes, purely academic. It may be that R.R. 4:88 is not applicable at all. It may be that even though plaintiff has not exhausted its administrative remedies, the question is solely one of law, see Nolan v. Fitzpatrick, 9 N.J. 477 (1952); Loboda v. Clark Tp., 74 N.J. Super. 159 (Law Div. 1962), or where the jurisdiction of the administrative tribunal is doubtful, or where the administrative remedy is illusory. See Naylor v. Harkins, 11 N.J. 435 (1953). See, generally, Jorgensen v. Pennsylvania R.R. Co., 25 N.J. 541, 556-568 (1958).
The "exhaustion" doctrine has been held to be of "limited application," a rule of convenience and not an indispensable condition precedent. Swede v. City of Clifton, 22 N.J. 303 (1956). Furthermore, the instant case, involving statutory construction, is one in which initial application to administrative officials before the courts is usually not mandatory. See, e.g., Deaney v. Linen Thread Co., 19 N.J. 578, 581 (1955).
In any event, under R.R. 4:88-14 the trial court may determine that notwithstanding the availability of administrative review, the exhaustion of that remedy need not be required where it is manifest that the interests of justice require *360 otherwise. Thus, as was recently reiterated by our Supreme Court in Durgin v. Brown, 37 N.J. 189, 202-203 (1962):
"The requirement for the exhaustion of the administrative remedy is neither jurisdictional nor absolute in its terms. * * * The cited rule [R.R. 4:88-14] which reflects prior decisional law, vests discretion in the trial court to determine whether the interests of justice require that the administrative process be by-passed.
There is no rigid formula for the exercise of that discretion. * * * The public interest in a speedy determination may be considered."
The court finds that the invocation of the judicial forum to determine (by way of declaratory judgment) the issues in this case was proper. The public importance of the issues and the overriding need for statutory construction justify the course of action taken. Plaintiff's demand for injunctive relief is denied. I should add, finally, that the public importance of the case disposes of defendants' contention that plaintiff is barred by laches. Cf. Schultz v. Wilson, 44 N.J. Super. 591, 605 (App. Div. 1957).
A form of judgment may be submitted in accordance with this opinion.
NOTES
[*] (Note: In 1960 the remaining 11 banks, and their two branches did not offer the service. In terms of total banking facilities, 31 out of 44 banks offered the services of demand deposit subject to withdrawal by check.)