KUSKIN, J.T.C.
Plaintiff, Town of Secaucus, challenges property tax exemptions for tax years 1998 and 1999 granted under the Fox-Lance Law, N.J.S.A. 40:55C-40 to -76, by the City of Jersey City to defendant 101 Hudson Street Associates (properly named 101 Hudson Urban Renewal Associates and hereinafter referred to as “Hudson Urban Renewal”) with respect to a forty story office building and related improvements located at 101 Hudson Street, Jersey City (the “Project”). Plaintiff contends that the Project did not qualify for exemption during the years under appeal for the following reasons:
1. After adoption by Jersey City’s governing body of an ordinance approving the exemption and the signing of a financial agreement by the City and Hudson Urban Renewal, a transfer of the Project occurred without approval by the City;
2. Hudson Urban Renewal is not the entity “enjoying” the tax exemption as required by the New Jersey Constitution and by statute;
3. The financial agreement between Jersey City and Hudson Urban Renewal provides for payment of an annual service charge that does not comply with statutory requirements;
4. The financial agreement requires payment of amounts, in addition to an annual service charge, not permitted by statute; and
5. Jersey City has failed to comply with the statutory requirement for certification that the financial agreement was in effect for the tax years under appeal.
In addition to denying that the tax exemption is in any respect violative of applicable statutes or the New Jersey Constitution, *392 defendants contend that plaintiffs appeals are barred under the doctrines of laches and estoppel.
Plaintiff and defendant Hudson Urban Renewal have moved for summary judgment. Jersey City joined in defendant’s motion. The State of New Jersey intervened as a party-defendant to defend the interpretation and constitutionality of the Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -20 (the “Long Term Law”), which replaced the Fox-Lance Law in 1992.
Based on the discussion and analysis set forth below, I hold as follows:
A. A transfer of the Project occurred without the approval of Jersey City in violation of the Fox Lance Law and Long Term Law, but the City has the right and authority to ratify the transfer;
B. Under the structure of ownership and operation of the Project, the entity which obtained the tax exemption is sufficiently enjoying the benefits of the exemption so that the Fox-Lance Law, the Long Term Law and the New Jersey Constitution have not been violated. However, for purposes of determining the obligation of Hudson Urban Renewal to make payments of excess profits to Jersey City, revenues generated by the operation and leasing of the Project to third-party tenants must be included in the calculation. Hudson Urban Renewal must redetermine whether it had excess profits for 1998 and 1999, and may avoid invalidation of the Project’s tax exemption by paying any amount due;
C. The annual service charge payable by Hudson Urban Renewal complies with the provisions of the Fox-Lance Law and Long Term Law for the years under appeal;
D. The payments in addition to the annual service charge required by the financial agreement were made before 1998, and, therefore, do not affect the validity of the Project’s tax exemption for 1998 and 1999;
E. Jersey City has failed to comply with the certification requirements of the Fox-Lance Law and Long Term Law, but *393 those requirements, as interpreted by this court in Town of Secaucus v. City of Jersey City and TPI Urban Renewal, 19 N.J. Tax 10, 36-39 (Tax 2000), (the “TPI Decision”), do not apply to tax years 1998 and 1999. Town of Secaucus v. City of Jersey City and TPI Urban Renewal, 19 N.J. Tax 538 (Tax 2001) (the “Supplemental TPI Decision”); and
F. Laches and estoppel do not bar plaintiffs appeals.
I.
Pacts
The undisputed (except as otherwise noted) factual background to this matter is as follows. The entity known as 101 Hudson Street Associates (“Hudson Associates”) is the owner of property in Jersey City located at 101 Hudson Street, designated on the City’s Tax Map as Block 38, Lot l.A (the “Subject Land”). Hudson Associates acquired the Subject Land on October 7, 1988 from Colgate-Palmolive Company. On the same date, Hudson Urban Renewal was formed, and, as lessee, entered into a ground lease for the Subject Land with Hudson Associates, as lessor. Also on October 7, 1988, Hudson Urban Renewal, as landlord, and 101 Hudson Leasing Associates (“Hudson Leasing”), as tenant, entered into a master lease for the Project. Hudson Urban Renewal, Hudson Associates, and Hudson Leasing (collectively the “Hudson Entities”) were partnerships and the partners of each were Linpro-Colgate Hudson Street Limited Partnership I (“Lin-pro-Colgate I”) and Linpro-Colgate Hudson Street Limited Partnership II (“Linpro-Colgate II”).
On or shortly after October 7, 1988, Hudson Urban Renewal filed with Jersey City an application for a fifteen-year property tax exemption for the Project pursuant to the Pox-Lance Law, which permitted tax exemptions for projects constructed in blighted areas, but required payment, in lieu of taxes, of an annual service charge, and limited the amount of profit which could be realized from a project. The application described the Project as a forty story office building containing 1,167,000 square feet of commercial space, of which approximately 15,000 square feet would be retail space. In addition, the Project would include an *394 indoor parking facility for approximately 1,000 cars. The application identified Hudson Associates as the lessor and Hudson Urban Renewal as the lessee under a ground lease requiring Hudson Associates to make certain site improvements and Hudson Urban Renewal to construct the core and shell of the proposed building. The ground lease rent would be $1,167,000 per year for a term of twenty-five years. The application disclosed that the Project would be subleased to Hudson Leasing, which would finish the lobbies and interior spaces and “be responsible for the leasing, maintenance and operation of the [Pjrojeet.” The major office tenant was to be Merrill Lynch, occupying approximately 324,000 square feet. The application described the rent payable by Hudson Leasing to Hudson Urban Renewal as consisting of (i) base rental of $1,167,000, (ii) an amount sufficient to cover taxes, the annual service charge, and debt service, and (iii) 5% of the total rents collected by Hudson Leasing in excess of $32,016,645.
The application set forth the need for tax abatement on the following basis: “Receiving the property tax relief authorized by Fox-Lance legislation is absolutely essential to this building’s ability to offer competitive rental rates in the New York/New Jersey regional market and insure the successful negotiation of a lease with Merrill Lynch.” The application proposed an annual service charge calculated at 2% of total Project cost, but payable at the rate of 1% per year for each of the first five years of the fifteen year exemption period, 2% per year for the next five years, and 3% per year for the final five years. This proposal reflected the need “to offset the substantial relocation costs of the building’s anchor tenant, Merrill Lynch.” The Project cost was estimated at $137,189,250, which would result in an average annual service charge of $2,743,785, the equivalent of approximately $2.35 per square foot of office space and, therefore, “comparable to or above competitive jurisdictions.”
Jersey City adopted an ordinance approving the tax exemption on February 23, 1989. The ordinance provided for an annual service charge of 2% total Project cost for five years, 2]£% for the next five years, and 3% for the third five years of a fifteen year exemption period. It also required Hudson Urban Renewal to contribute $1,750,500 to the construction of affordable housing in Jersey City and $750,000 to the cost of off-site infrastructure *395 improvements. The ordinance did not describe the leasing arrangements set forth above. On May 25, 1989, the City and Hudson Urban Renewal signed a financial agreement reflecting the terms set forth in the February 23 ordinance.
On October 11, 1989, the City adopted an amendatory ordinance which changed the annual service charge to 1% of total Project cost for the first five years, 2% for the second five years, and 3% for the third five years. The ordinance reduced the affordable housing contribution to $1,500,500, but required a $250,000 contribution for a job training program, and continued to require a $750,000 contribution to the cost of off-site infrastructure improvements. The amendatory ordinance did not describe the aforesaid leasing arrangements. An amended financial agreement reflecting the provisions of the ordinance (the “Financial Agreement”) was signed on December 11,1989.
On December 27,1989 the following occurred:
1. Hudson Street Owners Limited Partnership I (“Hudson Owners I”) and Hudson Street Owners Limited Partnership II (“Hudson Owners II”) were formed. The partners of these entities were Linpro-CP Hudson Street Limited Partnership (“Lin-pro-CP”), formerly known as Linpro-Colgate I,[1] the general partner and owner of a 25% interest in each entity, Green Equity, Inc. (“GEI”), a limited partner and owner of a 25% interest in each entity, and OTR, a limited partner and owner of a 50% interest in each entity.
2. Linpro-CP sold its entire interest in each of the Hudson Entities to Hudson Owners I.
3. Linpro-Colgate II sold its entire interest in each of the Hudson Entities to Hudson Owners II.
4. The partnership agreement of Hudson Urban Renewal was amended and restated to name Hudson Owners 1 and Hudson Owners II as the partners.
5. Linpro-Colgate II was dissolved.
*396 As a result of these events, the names of the Hudson Entities remained the same, and the Entities remained in common ownership. However, the ownership of each Entity totally changed. Linpro-CP, which (as Linpro-Colgate I) previously owned a direct interest in each of the Hudson Entities, after the December 27, 1989 owned a 25% interest in the two partners of each of the Hudson Entities. Linpro-Colgate II no longer held any interest, direct or indirect, in the Entities. GEI and OTR together owned a majority interest in Hudson Owners I and II. Schedules A and B attached to this Opinion illustrate the changes in ownership.
The partnership agreements of Hudson Urban Renewal and Hudson Owners I and II, respectively, contain certain provisions which are relevant to a determination of the issues before me. The original Hudson Urban Renewal agreement, with LinproColgate I and II as the partners, contained the following provisions:
A. Linpro-Colgate I was designated as managing partner;
B. the partnership would be “terminated and dissolved” upon the occurrence of the “withdrawal or dissolution of a partner;”
C. neither partner could transfer its interest in the partnership, and any attempt to transfer would be void; and
D. any modification of the partnership agreement had to be in writing.
After amendment and restatement on December 27, 1989, the Hudson Urban Renewal partnership agreement designated Hudson Owners I as managing partner and contained the provisions designed B, C, and D.
The partnership agreements for Hudson Owners I and Hudson Owners II contained the following provisions:
V. Linpro-CP (the owner of a twenty-five percent interest in each partnership) was designated as the general partner and given sole responsibility “for the day to day management and operation of the partnership’s business and, except as otherwise set forth in this Agreement, ... full, exclusive and complete discretion in the management and control of the partnership for the purposes set forth in Article IV.” Article IV described the principal purpose of each partnership as acquisition and holding of an interest in each of the Hudson Entities;
*397 W. the consent of OTR (the owner of a fifty percent interest in each partnership) was required for certain major decisions, which included, among others, the sale of the assets of the partnership or the assets of any of the Hudson Entities, the signing of any lease on terms less favorable to the partnership than those set forth in guidelines prepared by the parties, approval of the annual budget, and amendment of the lease with Merrill Lynch;
X. any partner that wished to sell its interest in the partnership was required to offer the interest to the other partners under a procedure set forth in the agreement;
Y. GEI had the option to purchase the interest of Linpro-CP in the partnership on specified anniversaries of the rent commencement date of the Merrill Lynch lease, and, in the event of an inability to agree as to the purchase price, the agreement provided for an appraisal process; and
Z. if GEI purchased Linpro-CP’s interest, OTR then had the right to elect to sell its interest to GEL
On December 31, 1996, the partnership agreements of Hudson Owners I and Hudson Owners II were restated and amended so that Linpro-CP and OTR were both named as general partners with GEI remaining as the limited partner. Linpro-CP remained as the managing partner. In addition to the requirement for OTR’s approval for the major decisions described above, OTR was granted the right to make those decisions by itself on behalf of each partnership.
On December 29, 1989, after the partners of the Hudson Entities had changed from Linpro-Colgate I and II to Hudson Owners I and II, the ground lease between Hudson Associates and Hudson Urban Renewal was amended and restated, as was the master lease between Hudson Urban Renewal and Hudson Leasing. As amended and restated, the ground lease provided for a rent of $1,167,000 per annum, and required the lessee, Hudson Urban Renewal, to pay all real estate taxes, payments in lieu of taxes and other taxes and assessments, as well as provide insurance and assume obligations with respect to the construction of the proposed building. The amended and restated master lease required payment of a base rent of $1,167,000. The lease also *398 required the payment of annual percentage rent in an amount “equal to five percent (5%) of the amount by which Gross Rentals of the Premises for the Calendar Year in question exceeds (sic) $32,016,645.00 during the Calendar Year in question, but in no event an amount which would cause the Landlord [ (Hudson Urban Renewal)] to be required to pay the excess profit charge set forth in NJSA 40:55C-56.” This limitation on percentage rent was not included in Hudson Urban Renewal’s application for tax exemption discussed above.
Construction of the Project commenced in 1990, and the first annual service charge payment by Hudson Urban Renewal occurred with respect to the year ending December 31, 1992. For each year thereafter, including tax years 1998 and 1999, Hudson Urban Renewal paid to Jersey City an annual service charge in accordance with the Financial Agreement based on total Project cost which was ultimately determined to be $139,775,906. For 1998 and 1999, that payment was 2% of the total project cost, or $2,795,518 for each year. In addition to paying the annual service charge, Hudson Urban Renewal submitted a computation to. the City demonstrating that it realized no profit in excess of the amount permitted by statute.
II.
Transfer of the Project
I address first the issue of whether a transfer of the Project occurred in violation of the Fox-Lance Law or the Long Term Law. As of the date the tax exemption for the Project was authorized by ordinance and the Financial Agreement was signed, the law in effect was the Fox-Lance Law. This legislation was repealed by L. 1991, c. 431, § 20, effective April 17, 1992, and replaced by the Long Term Law. In order to provide for continuity between the Fox-Lance Law (and other laws replaced by the Long Term Law), N.J.S.A. 40A:20-19, a provision of the Long Term Law, states that the term “urban renewal association” as used in the Fox-Lance Law is deemed to refer to an “urban *399 renewal entity” under the Long Term Law and also states that “the law in which the term occurs [ (here, the Fox-Lance Law) ] shall be construed with respect to, and in a manner consistent with, this act.”
The provision of the Fox-Lance Law relating to the transfer issue is N.J.S.A. 40:55C-55.1(e), which prohibits an urban renewal association from voluntarily transferring “the project undertaken by it under the terms of this act” provided that the restriction “shall not be applied to prevent the transfer of a project to another urban renewal association or corporation which, with the consent of the municipality in which the project is located, shall assume all the contractual obligations of the transferor association or corporation under its financial agreement with the said municipality.” Under N.J.S.A. 40:55C-56, upon the transfer of a project with the consent of the municipality, the transferor is discharged from any further obligation under the financial agreement. The parallel provisions of the Long Term Law are N.J.S.A. 40A:20-5c and N.J.S.A. 40A:20-6.
Plaintiff contends that the change in identity of the partners of Hudson Urban Renewal, which occurred in 1989, constituted a prohibited transfer under the terms of the quoted statutory provisions because the City did not consent. As part of this contention, plaintiff asserts that the Hudson Urban Renewal entity which signed the Financial Agreement was dissolved and terminated on December 27, 1989 and that the entity of the same name which operated the Project thereafter was a new partnership having no tax exemption agreement with Jersey City.
In support of this latter argument, plaintiff refers to the partnership agreement of Hudson Urban Renewal which expressly provided that the partnership terminated and dissolved upon the withdrawal or liquidation of a partner. Plaintiff notes that both Linpro-Colgate I and II, the original partners, withdrew from Hudson Urban Renewal and sold their respective partnership *400 interests to Hudson Owners I and II, and, on the same date, Linpro-Colgate II was dissolved. As a result, plaintiff asserts, the Hudson Urban Renewal entity to which Jersey City granted a tax exemption ceased to exist under the express provisions of its partnership agreement. Plaintiff also asserts that the initial Hudson Urban Renewal partnership ceased to exist, as a matter of law, under provisions of the Uniform Partnership Law, N.J.S.A. 42:1-1 to -43 (“UPA”), then in effect in New Jersey. Plaintiff notes that the federal income tax returns filed by Hudson Urban Renewal after December 27, 1989 showed that date as the “date business started.” Plaintiff contends that this confirms the creation of a new partnership to which the Project was transferred, as does the provision in Section 2.1 of the amended and restated partnership agreement that “a partnership is hereby formed.”
In response, defendants contend that the controlling statute is the revised Uniform Partnership Act enacted in New Jersey in 2000 and codified as N.J.S.A. 42:1A-1 to -43 (“RUPA”), which should be applied retrospectively. Defendants assert that, under RUPA, transfers of partnership interests do not result in a dissolution of the initial partnership. Plaintiff replies that RUPA cannot be applicable because it was not in effect as of the relevant assessment dates, October 1, 1997 and October 1, 1998. In addition, plaintiff contends that, even if RUPA is the governing law, under N.J.S.A. 42:1A — la RUPA controls only in the absence of express provisions in the partnership agreement and that, here, the agreement for Hudson Urban Renewal specifically provided that the withdrawal or dissolution of either of the partners would result in the termination of the partnership.
Defendants explain the use of the December 27, 1989 date as a mistake based on the date of formation of Hudson Owners I and II and argue that, even if the date of commencement of business for Hudson Urban Renewal, with Hudson Owners I and Hudson Owners II as its partners, is deemed to be December 27, 1989, that date is based on the Internal Revenue Service definition of commencement of business and does not constitute an acknowledgment of the formation of a new entity. Defendants further assert that the introductory paragraph of the amended and restated partnership agreement, which recites the formation of the *401 partnership on October 7, 1988 and the desire of the parties to amend and restate the agreement, eliminates the significance of the language in Section 2.1 of the agreement.
I need not resolve the partnership law issues because I conclude that a material change in ownership of Hudson Urban Renewal occurred without Jersey City’s consent or approval, and that this change constituted a transfer of the Project. Consequently, whether Hudson Urban Renewal was dissolved and reformed or continued as the same entity after the sales of partnership interests by Linpro-Colgate I and II to Hudson Owners I and II, the Fox-Lance Law and Long Term Law were violated. In reaching this conclusion, I have assumed, as noted above, that Linpro-CP represents the same interest as Linpro-Colgate I (although plaintiff disputes that the two entities are identical).
Linpro-Colgate I and II owned 100% of Hudson Urban Renewal as of the date the ordinance and amendatory ordinance authorizing the tax exemption for the Project were adopted and the Financial Agreement signed. After the transactions on December 27, 1989, the successor entity to Linpro-Colgate I owned only a 25% interest in Hudson Owners I and II, which, in turn, were the partners of Hudson Urban Renewal. The other partners of Hudson Owners I and II were OTR and GEI, owning 50% and 25% of each partnership, respectively. This constitutes a material change in the ownership of Hudson Urban Renewal. The significance of the change is not ameliorated or reduced by the 25% interest of Linpro-CP or by the designation of Linpro-CP as the managing partner of Hudson Owners I and II. As explained above, OTR retained the right to participate in and approve major decisions with respect to the operation of each partnership, including the right to approve the annual budget and the right to approve leases which deviated from specified leasing guidelines. Linpro-CP, therefore, not only no longer owned a direct interest in Hudson Urban Renewal but also no longer was in total control of Hudson Owners I or II. In 1996, Linpro-CP’s already limited authority diminished substantially when OTR became a co-general partner and was given the right to make major decisions on its own.
*402 My conclusion that a change in ownership of Hudson Urban Renewal occurred without approval by Jersey City is meaningful under the Fox-Lance Law and Long Term Law only if the change resulted in a transfer of the Project for which the statutes require municipal consent and approval. Whether the change in ownership constituted a transfer of the Project can be determined by reference to the provisions of both Laws. Under N.J.S.A. 40A:20-5(e), a provision of the Long Term Law, the formative document for an urban renewal entity must include the following provision:
that the entity shall not voluntarily transfer more than 10% of the ownership of the project or any portion thereof undertaken by it under this act, until it has first removed both itself and the project from all restrictions of this act in the manner required by this act .. with the exception of transfer to another urban renewal entity, as approved by the municipality in which the project is situated____The entity shall file annually with the municipal governing body a disclosure of the persons having an ownership interest in the project, and of the extent of the ownership interest of each.
[N.J.S.A. 40A:20-5(e)J
Consistent with this provision, N.J.S.A. 40A:20-6 contemplates a transfer by an urban renewal entity to another urban renewal entity “with the consent of the municipality in which the project is located.” Only if municipal consent is granted is the transferor “discharged from any further obligation under the financial agreement.” Ibid.
These provisions of the Long Term Law, when read together, indicate a legislative concern as to the identity of the ownership of an urban renewal entity. The Legislature apparently desired to enable a municipality to assure itself that the owners of the entity are satisfactory and competent to construct and operate a project. I conclude, therefore, that, under the Long Term Law, a transfer of a project occurs when there is a transfer of a substantial portion of the ownership interests in an urban renewal entity. Under N.J.S.A. 40A:20-19, the Fox-Lance Law should be interpreted in a manner consistent with the Long Term Law. Consequently, I interpret the requirement in the Fox-Lance Law for municipal consent to a transfer of a project as applicable to a transfer of a substantial portion of the ownership interests in an urban renewal entity. This interpretation is consistent with the provisions in N.J.S.A. 40:55C-55.1(e) and -56 that an urban renewal entity cannot be discharged of its obligations under a *403 financial agreement until the municipality has consented to a transfer to a new urban renewal entity.
Based on the preceding discussion, I conclude that the consent of Jersey City was required for the sale of ownership interests in Hudson Urban Renewal by Linpro-Colgate I and II to Hudson Owners I and II, whether or not the transfer resulted in the dissolution of the original Hudson Urban Renewal partnership and the formation of a new partnership with the same name. This consent was not obtained. However, full disclosure was made to the City of the proposed transaction and the identity of the parties involved. Counsel for Hudson Urban Renewal, in correspondence with the Jersey City Corporation Counsel, characterized the transaction as a “restructuring” of the partnership. The Assistant Corporation Counsel responded that he wasn’t certain whether the transaction was a restructuring or a transfer of the project, and, if the latter, approval by the City would be required.
Under these circumstances, where full disclosure was made contemporaneously with the occurrence of the transaction, the failure to obtain approval of the City at the time should not automatically be fatal to the effectiveness of the transfer and invalidate the tax exemption. Accordingly, I conclude that consent by Jersey City to the transfer may still be obtained, and Jersey City may now ratify the transfer. See Gonzalez v. Board of Educ., 325 N.J.Super. 244, 255-56, 738 A.2d 974 (App.Div.1999) (describing the authority of a public body to ratify a public contract which is not ultra vires). See also Houman v. Mayor and Council of Pompton Lakes Bor., 155 N.J.Super. 129, 159, 382 A.2d 413 (Law Div.1977) (stating that “|w]hatever a public body may authorize, it may subsequently ratify .... ”). Sixty days is a reasonable time limit for the granting of such consent and ratification. Therefore, if Jersey City, by appropriate action taken within sixty days, consents to and ratifies the transfer from Linpro Colgate I and II to Hudson Owners I and II, the transfer in itself will not violate the Fox-Lance Law or Long Term Law. If, however, Jersey City refuses to consent to and ratify the transfer, then the tax exemption granted to Hudson Urban Renewal for tax years 1998 and 1999 was improperly and invalidly granted.
*404 III.
Enjoyment of the Tax Exemption
Plaintiffs second challenge to the tax exemption granted to the Project for 1998 and 1999 is that, because of the structure of the ownership and operation of the Project, the entity which received the exemption was not the entity enjoying the exemption. Plaintiff bases its argument on a provision of the New Jersey Constitution which declares the development and redevelopment of blighted areas to be a public purpose and authorizes exemption from taxation “in whole or in part, for a limited period of time during which the profits of and dividends payable by any private corporation enjoying such tax exemption shall be limited by law.” N.J. Const. art. VIII, § 3, 111. Plaintiff describes Hudson Urban Renewal as a pass-through entity that received annual rent of $1,167,000, and remitted the same amount to Hudson Associates. Plaintiff asserts that the entity “enjoying” the tax exemption was Hudson Leasing which received rental income from Merrill Lynch and other occupants of the Project far in excess of the rent it paid to Hudson Urban Renewal.
Under the Fox-Lance Law and Long Term Law, the financial agreement must provide that the profits of the urban renewal entity are limited. N.J.S.A. 40A:20-9a; N.J.S.A. 40:55C-59(a). If the net profits of the entity exceed the allowable net profit for each fiscal year, within ninety days after the end of the fiscal year the entity must pay the excess net profit to the municipality “as an additional service charge.” N.J.S.A. 40A:20-15; N.J.S.A. 40:55C-66. The allowable profit rate for an entity such as Hudson Urban Renewal is 1)4% above the interest rate payable on the entity’s initial permanent mortgage financing, and, if there is no permanent mortgage, then 1)4% above the prevailing mortgage rate on similar improvements in the county, as determined by the municipality. N.J.S.A. 40A:20-3b; N.J.S.A. 40:55CM8. Net profit is defined as gross revenues less all operating and non-operating expenses, including payments to the municipality of excess profits, amounts sufficient to amortize the project costs over the life of the improvements, the annual service charge, and all other reasonable operating expenses. Depreciation, interest on debt, income taxes, *405 and salaries or other compensation paid to partners or other persons having an ownership interest in the entity are not deductible expenses. N.J.S.A. 40A:20-3c; N.J.S.A. 40:55C-o0. Gross revenue under the Fox-Lance Law is “the total annual gross rental and other income of an urban renewal [entity],” N.J.S.A. 40:550-51, and under the Long Term Law is “annual gross revenue or gross shelter rent or annual gross rents as appropriate, and other income, for each urban renewal entity.” N.J.S.A. 40A:20-3a.
For each of the years under appeal and prior years, Hudson Urban Renewal submitted to Jersey City a report entitled “Schedule of Additional Annual Service Charge in Lieu of Taxes” which contained a computation of the entity’s net profit. For each year, the report showed no profit in excess of the amount allowed by statute. The computation took into account only revenues received by Hudson Urban Renewal from Hudson Leasing as base rent, payment of Hudson Urban Renewal’s debt service, and payment of real estate taxes and other impositions. The computation did not include the revenues received by Hudson Leasing from the tenants of the Project. Plaintiff contends that this calculation is a distortion of the true operating results of the Project and violative of the applicable statutes which contemplate that excess profit from the operation of a project will benefit the municipality that granted the tax exemption.
A similar argument made by plaintiff relating to structure and “enjoyment” of the exemption was discussed in the TPI Decision. There, I held that “[n]either the Constitution nor either [the Fox-Lance Law or Long Term Law] provides that the entity whose profits and dividends are limited may not permit occupancy and use of the project by others, or that such entity must be actively operating or using the property.” Id. at 39-40. I further held that “neither the Constitution nor the Fox Lance Law or Long Term Law requires that the entity obtaining the tax exemption be actively involved in all aspects of construction, operation and maintenance of the property.” Id. at 40. I concluded that TPI Urban Renewal Corporation, the entity which had obtained a tax exemption from Jersey City, did not violate the provisions of the Constitution or either Law when it entered into a sublease with one of its subsidiaries, which, in turn, licensed the use of the *406 project to another related entity. I also found that the corporation did not divest itself of all obligations with respect to the exempt project and, therefore, was “enjoying benefits of the exemption.” Ibid.
Plaintiff argues that my analysis in the TPI Decision was either erroneous or the result of a misunderstanding of plaintiffs contentions. I have examined the TPI Decision and reviewed the applicable statutes and conclude that I understood plaintiffs argument and correctly ruled that neither the Fox-Lance Law nor the Long Term Law prohibits the ownership and operating structure at issjue in the TPI Decision, or the structure in place here. Under the master lease, Hudson Urban Renewal, as landlord, is obligated to construct the core and shell of the Project, is responsible for obtaining insurance for the replacement value of its construction work, and is responsible for restoration of the building in the event of fire or casualty damage. In addition, as noted above, it receives rent in excess of that payable by it to Hudson Associates, specifically, rent related to debt service and possible percentage rent. Hudson Urban Renewal, therefore, is enjoying the tax exemption, and its profits are limited pursuant to the Financial Agreement as required by the New Jersey Constitution.
Even though the structure for the ownership and operation of the Project satisfies the requirements of the statutes and is constitutional, that structure does not control the calculation of excess profit under the Fox-Lance Law and the Long Term Law. The Hudson Entities have common ownership. The Entities may have had valid business reasons for the ownership and operational structure they created, and the Fox-Lance Law and Long Term Law do not preclude that structure. However, both the Fox-Lance Law and Long Term Law require that the calculation of the financial obligations of the urban renewal entity be based on the revenue from the Project. The structure under which a project is owned and operated cannot be used to circumvent this requirement by diverting project income, and thus unlimited profits, from an urban renewal entity to a non-urban renewal entity in common ownership.
*407 I derive my conclusion as to revenue computations from the following statutory analysis. As discussed above, both the Long Term Law and Fox-Lance Law set forth the methodology for calculating net profits. The deductions allowable in that calculation all relate to ordinary operating expenses for the project. N.J.S.A. 40A:20-3c; N.J.S.A. 40:55C-50. As part of its application for a tax exemption, an urban renewal entity must submit a fiscal plan “for the project” not merely for the entity. N.J.S.A. 40A:20-8e; N.J.S.A. 40:550-58.
The Long Term Law and Fox-Lance Law, respectively, define gross revenue as follows:
“Gross revenue” means annual gross revenue or gross shelter rent or annual gross rents, as appropriate, and other income, for each urban renewal entity designated pursuant to this act. The financial agreement shall establish the method of computing gross revenue for the entity, and the method of determining insurance, operating and maintenance expenses paid by a tenant which are ordinarily paid by a landlord, which shall be included in the gross revenue.
[N.J.S.A. 40A:20-3a.]
“Annual gross revenue” means the total annual gross rental and other income of an urban renewal corporation or association from the project. If in any leasing, any real estate taxes or assessments on property included in the project, any premiums for fire or other insurance on or concerning property included in the project or any operating or maintenance expenses ordinarily paid by a landlord are to be paid by the tenant, then such payment shall be computed and deemed to be part of the rent and shall be included in the annual gross revenue. The financial agreement hereinafter provided for shall establish the method of computing such additional revenue and may establish a method of arbitration where either the landlord or the tenant dispute the amount of such payments so included in the annual gross revenue.
[N.J.S.A. 40:55C-51.]
These definitions reflect a legislative understanding and intent that the revenue to be included in calculating net profit is that generated by the project, including rents from tenants of the project. The definitions do not contemplate that project revenue may be artificially limited by virtue of a leasing structure under which an entity other than the urban renewal entity operates and leases the project.
In its provisions relating to payment of excess profits to the municipality, the Long Term Law provides:
*408 The entity may maintain during the term of the financial agreement a reserve against vacancies, unpaid rentals and contingencies in an amount established in the financial agreement not to exceed ten percent of the gross revenues of the entity for the last full fiscal year, and may retain such part of those excess net profits as is necessary to eliminate a deficiency in that reserve. Upon the termination of the financial agreement, the amount of reserve, if any, shall be paid to the municipality.
[N.J.S.A. 40A:20-15.]
A similar provision was contained in N.J.S.A. 40:55C-66. This language also reflects a legislative understanding and intent that the revenues to be calculated for purposes of determining net profit are the revenues of the project.
Finally, the Long Term Law contains provisions not included in the Fox-Lance Law relating to the rights of the municipality to protect residents of a housing project facing a “financial emergency.” N.J.S.A 40A:20-18. Under these circumstances, the Local Finance Board in the New Jersey Department of Community Affairs may summon “an appropriate official of the entity” to a hearing conducted by the Board and require the production of documents, witnesses and information as well as requiring an audit. The Board may impose a financial plan which the entity will be required to follow. These provisions assume that the “entity” is operating the project and, therefore, officials and records of the entity are needed to remedy the emergency. The Project is not a housing project. Consequently, the provisions of N.J.S.A. 40A:20-18 are not applicable. The provisions are relevant, however, because they confirm the legislative understanding and intent reflected in the other statutory provisions discussed above.
Neither the Fox-Lance Law nor the Long Term Law expressly prohibits the creation of the type of ownership and operational structure reflected by the agreements between and among the Hudson Entities, nor does either law expressly require that all revenues of the Project be included in the calculation of excess profits. However, only by including all project revenues can a fair calculation of net profits be made, and the legislatively mandated limitation on excess profits be effectuated. Under the arrangements among the Hudson Entities, the real revenues from *409 the Project have been transferred to an entity in common ownership which is not subject to the profit limitations contained in the Fox-Lance Law or the Long Term Law. As described above, the master lease between Hudson Urban Renewal and Hudson Leasing contains an express limitation on percentage rent to prevent Hudson Urban Renewal from realizing excess profit (a limitation not disclosed in the application for tax abatement). These arrangements constitute a circumvention of the purposes and objectives of both Laws. By using Project revenues to calculate excess profits, this circumvention can be prevented and the provisions of the Fox-Lance Law and Long Term Law as to excess profits can be enforced.
No reported decision has interpreted either the Fox-Lance Law or the Long Term Law in a context similar to that before me with respect to the calculation of revenues for purposes of the excess profits computation. Under these circumstances, before invalidating the exemption granted to the Project for tax years 1998 and 1999, I will afford Hudson Urban Renewal an opportunity to pay to Jersey City any excess profits that may be due based on Project revenues. This is a form of prospective application of my ruling and is appropriate “where a court renders a first-instance or clarifying decision in a murky or uncertain area of the law but under circumstances where members of the public or public entities could be found to have previously and not unreasonably relied on a different conception of the state of the law.” Oxford Consumer Discount Co. v. Stefanelli, 104 N.J.Super. 512, 521, 250 A.2d 593 (App.Div.1969), aff'd, 55 N.J. 489, 262 A.2d 874 (1970) (citations omitted).
I will allow defendants a period of sixty days within which to calculate the excess profit payments, if any, due to Jersey City for tax years 1998 and 1999 and for Hudson Urban Renewal to make payment of the amounts due. A copy of the calculation and evidence of any payment shall promptly be provided to plaintiff. Jersey City shall certify to the court the amount of the payment due and when the payment is made. If the payment is made within the sixty day period, the failure previously to make the *410 payment will not affect the Project’s qualification for exemption. If, however, the payment is not made within the sixty day period, then Hudson Urban Renewal will be deemed in material breach of the Financial Agreement, thereby precluding the granting of a tax exemption for 1998 and 1999.
IV.
Amount of the Annual Service Charge
The third basis for plaintiffs challenge to the tax exemption granted to the Project is that the annual service charge payable under the Financial Agreement violates the Fox-Lance Law and Long Term Law. In the TPI Decision, I held that the provisions of both Laws setting the amount of the annual service charge were mandatory and not directory. TPI Decision, supra, 19 N.J.Tax at 35-36. I described the annual service charge as “an essential and core element of the tax exemption scheme,” and “a significant material term” of a financial agreement. Id. at 36. I concluded that a deviation from the statutory requirements “constitutes material non-compliance” with those requirements. Ibid. I adhere to my rulings.
The Financial Agreement provides for an annual service charge in the amount of 1% of total Project cost for the first five years of the term of the Agreement, 2% of total Project cost for the next five years, and 3% of total Project cost for the third and concluding five years. Plaintiff asserts that the Fox-Lance Law and the Long Term Law require that the annual service charge for the Project be in an amount equal to 2% of the total Project cost for each year of the term of the Financial Agreement, and not an average of 2%. In support of this assertion, plaintiff cites the provisions in N.J.S.A 40:550-65 and N.J.S.A 40A:20-12 that a claim for exemption will not be allowed unless the municipality certifies that a financial agreement with an urban renewal entity “has been entered into and is in effect as required by this act.”[2] *411 (Emphasis added.) Plaintiff contends that Jersey City could not provide this certification because the annual service charge provisions of the Financial Agreement do not comply with the requirements of the Fox-Lance Law or Long Term Law.
Defendants make two responses: (1) the Long Term Law was intended to introduce additional flexibility into the calculation of the annual service charge so that the payment structure under the Financial Agreement is permitted, particularly when the annual service charge over the term of the agreement averages 2% of total Project cost per year, and (2) during the years under appeal, 1998 and 1999, the annual service charge was 2% of total project cost.
In the TPI Decision, I discussed this issue in a context in which the annual service charge was 2% of total project cost for the first five years of the fifteen year term of a financial agreement and then escalated by .05% per year throughout the remaining ten years of the term. The annual service charge for the years under appeal exceeded 2%. After analyzing the express language of N.J.S.A. 40A:20-12b(l) and N.J.S.A. 55C-65c (the applicable provisions of the Long Term Law and Fox-Lance Law) and legislative history,[3] I concluded that the statutes required the annual service charge to be 2% of total project cost, no more and no less. Accordingly, I held that the excessive annual service charge was a basis for denying the exemption for the years under appeal. I incorporate by reference my analysis of the statutory provisions *412 and legislative history contained in the TP I Decision. 19 N.J.Tax at 32-36.
I reject defendants’ argument that the Long Term Law permits flexibility in the amount of the annual service charge because N.J.S.A. 40A:20-12b(2) permits the municipality to accept, in lieu of the annual service charge otherwise provided in the statute, a phased-in payment over five stages of the exemption period. During the first stage, which must be a minimum of six years, the payment must be in the amount of the agreed annual service charge. However, during the next four stages, each of which may have a term of one to six years, the municipality may agree to accept an annual amount equal to the greater of the agreed annual service charge or a percentage of the taxes which would otherwise be due on the land and improvements included in the Project. Thus, in no event may the amount payable as an annual service charge be greater or less than 2% of total project cost. See TPI Decision at 34-35.
I also reject defendants’ argument that the Financial Agreement satisfies the statutory requirements because the annual service charge averages 2% of total Project Cost. The statutes require that, in the case of developments such as the Project, the annual service charge “shall be a sum equal to 2% of the total project cost,” N.J.S.A. 40:55C-65c, or “shall be 2%” of total project cost, N.J.S.A. 40A:20-12(b)(l), not an average of 2%. The statutory percentage constitutes a legislative determination of what constitutes an appropriate annual amount to be paid by an urban renewal entity “for municipal services supplied to the project.” N.J.S.A. 40A:20-12b..
Even though the annual service charge during the first five years and third five years of the fifteen year term of the Financial Agreement is an absolute 1%, and a relative 50%, below or above the statutory percentage, the annual service charge for the years under appeal, 1998 and 1999, is in the amount required by statute. Plaintiff is not challenging the over-all validity of the Financial Agreement or the entirety of the exemption granted to *413 Hudson Urban Renewal. Plaintiff seeks only a denial of the exemption for the years under appeal, and “is not seeking to nullify any ordinance, to disturb any abatement granted for a prior year, or to prevent any defendant from modifying or amending a financial agreement with respect to future tax years.” Plaintiffs Letter Brief of October 2, 2002 at 2. Consequently, the fact that the annual service charge payable during other years violated or will violate the statutory requirements is not an appropriate basis to deny the exemption for 1998 or 1999. Jersey City could certify that, for those years, the Financial Agreement was in effect “as required by” the Fox-Lance Law and Long Term Law.
Based on the preceding discussion, I conclude that, for tax years 1998 and 1999, the tax exemption granted to the Project cannot be denied based on the amount of the annual service charge.
V.
Additional Payments
The fourth basis for plaintiffs challenge to the Project’s tax exemption for 1998 and 1999 is that, under the ordinance approving the exemption. Hudson Urban Renewal was obligated to make a contribution to Jersey City of $1,750,500 (the “Contribution”), $1,500,500 of which was for the construction of affordable housing units in the City and $250,000 of which was for the establishment of a job training program for residents of the City. The Financial Agreement contained no provisions relating to the Contribution. Those provisions were set forth in a separate agreement of the same date as the Financial Agreement. The separate agreement required payment of the Contribution as follows:
A. 25% when the first building permit for the Project was issued;
B. 25% when a temporary or permanent certificate of occupancy was issued; and
C. the balance over an agreed period for initial rental of space in the Project.
*414 The first payment was made on July 27, 1990, and the final payment was made on January 5,1996.
Plaintiff asserts that the Fox-Lance Law and Long Term Law do not permit payments such as the Contribution, and that this violation of both Laws invalidates the exemption. Plaintiffs appeals relate only to tax years 1998 and 1999. Plaintiff does not seek relief for years covered by the Financial Agreement prior to 1998, and, in these appeals, seeks no relief for any years following 1999. During the years under appeal, Hudson Urban Renewal was not required to make any Contribution payments. Consequently, the obligation to pay the Contribution does not warrant invalidating the tax exemption for 1998 or 1999, even if requiring payment of the Contribution may have violated the Fox-Lance Law or Long Term Law (an issue that I need not, and do not, decide). This conclusion is consistent with the analysis in Section IV of this Opinion relating to the annual service charge.
VI.
Certification Requirement
Plaintiffs fifth, and last, basis for challenging the 1998 and 1999 tax exemptions granted to the Project is that, for these years, Jersey City failed to supply the certification required by statute. Both the Fox-Lance Law and Long Term Law provide that no “claim [for exemption] shall be allowed” unless the municipality in which a project is located “shall certify that a financial agreement ... has been entered into and is in effect as required by the provisions of this act.” N.J.S.A. 40:55C-65; N.J.S.A. 40A:20-12. In the TPI Decision, supra, 19 N.J.Tax at 36-39, I analyzed this provision and concluded that the statutes mandated an “annual certification from the governing body ... [to be] provided before the assessor submits the municipal tax assessment list to the county board of taxation pursuant to N.J.S.A 54:4-35.” Id. at 38. In the Supplemental TPI Decision, supra, 19 N.J.Tax 538, I noted that, in a bench opinion, I had modified the TPI Decision by holding that the municipal governing body had the right to *415 “delegate the certification responsibility to an appropriate municipal official under appropriate procedures.” Id. at 540. In addition, I held that the certification requirement was not applicable to the years under appeal in the TPI matter, 1998 and 1999, because my interpretation of the requirement constituted a “ ‘clarifying decision in a murky or uncertain area of the law,’ ” id. at 542, which should be applied prospectively. Under the concept of “fundamental fairness,” I concluded that my prospectivity ruling applied to the matter before me because
the policy considerations in favor of rewarding a successful litigant who has stretched the law or obtained a first time interpretation of the law are less significant than the policy considerations in favor of upholding Fox-Lance Law or Long Term Law tax exemptions where neither Jersey City nor any developer could determine from the express language of N.J.S.A. 40:55C-65 or N.J.S.A 40A:20-12, or from language contained in another statute in the same chapter, that the certification requirement functioned as I have interpreted it.
IId. at 544.]
My analysis of the certification requirement as set forth in the TPI Decision and the Supplemental TPI Decision is applicable in this matter. Jersey City did not provide the annual certifications which are required under the TPI Decision. However, the factors on which I based my prospectivity rulings in the Supplemental TPI Decision are equally applicable here. The TPI Decision is dated May 19, 2000. Thus, neither Jersey City nor Hudson Urban Renewal was aware of my interpretation of the certification requirement as of the date the certifications for 1998 and 1999 should have been provided pursuant to the TPI Decision. Under these circumstances, I adhere to my interpretation of the certification requirement as set forth in the TPI Decision, and my ruling in the Supplemental TPI Deciswn that the requirement is not applicable to tax years 1998 and 1999. For those years, therefore, Jersey City’s failure to provide certifications is not a basis for invalidating the exemption granted to the Project.
VII.
Laches and Estoppel
Laches and estoppel are similar doctrines. I discussed both doctrines and the standards for their application in the TPI *416 Decision, supra, 19 N.J.Tax at 24-32. The basic definition of laches is “ ‘such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.’ ” Lavin v. Board of Educ. of Hackensack, 90 N.J. 145, 151, 447 A.2d 516 (1982) (quoting from 2 Pomeroy, Equity Jurisprudence § 419, at 171-72 (5th ed.1941)). Our Supreme Court has defined estoppel as follows:
The essential principle of the policy of estoppel ... is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong' to one who with good reason and in good faith has relied upon such conduct____It has to do with the inducement of conduct to action or nonaction.
[Middletown Tp. Policemen’s Benevolent Ass’n v. Middletown Tp., 162 N.J. 361, 367, 744 A.2d 649 (2000) (quoting from Summer Cottagers' Ass’n of Cape May v. City of Cape May, 19 N.J. 493, 503-04, 117 A.2d 585 (1955)) (citations omitted).]
In the TPI Decision, the arguments advanced by the parties as to laches and estoppel were essentially the same as those now before me. Thus, plaintiff, Town of Seeaucus, contended that neither doctrine could or should apply because plaintiff had filed timely tax appeals. TPI and Jersey City argued that either or both doctrines must apply because years had elapsed between the granting of the tax exemption in issue and the filing of Secaueus’s appeals, and TPI and Jersey City relied to them detriment on the absence of any challenge to the exemption filed promptly after it was granted. After analyzing policy considerations and legal precedents, I held as follows:
[E]ven though laches and estoppel are not applicable to appeals of assessments imposed, or exemptions granted, by a tax assessor, both doctrines should be applicable to appeals from exemptions granted pursuant to the Fox-Lance Law or Long Term Law, but with limitations reflective of the policy concerns discussed above. An equitable balancing of (i) defendant’s reliance interest with (ii) plaintiffs statutoiy right of appeal, and of (iii) the public policy in favor of development and redevelopment of blighted areas with (iv) the public policy of equitable distribution of the tax burden and restriction of exemptions, is achieved if laches or estoppel is applicable to plaintiffs appeals only if defendants establish by a preponderance of the evidence that plaintiff had timely actual knowledge of the adoption of the Ordinance [granting the tax exemption] or timely actual knowledge of facts sufficient to impose on plaintiff a duty of inquiiy as to adoption of the Ordinance.
[TPI Decision, supra, 19 N.J.Tax at 28.]
*417 Upon further reflection, and consideration of the briefs and arguments of counsel in this matter and related matters,[4] I have concluded, for the reasons set forth below, that my analysis of laches and estoppel in the TPI Decision was inconsistent with other rulings in the Decision, and, therefore, was incorrect. See Johnson v. Cyklop Strapping Corp., 220 N.J.Super. 250, 257, 531 A.2d 1078 (App.Div.1987) (holding that a “trial court has the inherent power, to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders [(my rulings as to laches and estoppel in the TPI Decision were interlocutory)] at any time prior to the entry of final judgment.”)
In addition to addressing laches and estoppel, the TPI Decision addressed the issue of whether plaintiffs appeals were timely filed. TPI Decision, supra, at 22-24. I concluded that the filings were timely because each appeal sought relief only for the year under appeal, and each was filed before expiration of the April 1 filing deadline for local property tax appeals. N.J.S.A. 54:3-21. I relied on the following:
1) language in the Fox-Lance Law and Long Term Law that exemptions under either Law “shall be claimed and allowed in the *418 same or a similar manner as in the case of other real property exemptions,” N.J.S.A. 40:44C-65, N.J.S.A. 40A:20-12;
2) Morris Tp. v. LF Assocs., 10 N.J.Tax 240 (Tax 1988), which held that, under the same language appearing in the Urban Renewal Non-Profit Corporation Law of 1965 (repealed with the Fox-Lance Law in 1992 and replaced by the Long Term Law), a tax exemption under that Law “is to be reviewed by the Tax Court in the same manner as all other tax exemptions,” id. at 246, and, therefore, the deadline for appeal was the same as that generally applicable to tax appeals; and
3) Tru Urban Renewal Corp. v. City of Newark, 11 N.J.Tax 63 (Tax 1990), holding that the granting or denial of exemptions under the Fox-Lance Law is reviewable in the Tax Court, either on appeal from a county board of taxation judgment under N.J.S.A 54:51A-l(a) or by direct appeal under N.J.S.A. 54:3-21. Id. at 70.
I adhere to my ruling in the TPI Decision that the time limit for plaintiff to file its appeals was April 1 of each pretax year as set forth in N.J.S.A. 54:3-21 and not the forty-five day period for actions in lieu of prerogative writs contained in R. 4:69-6(a). As demonstrated by Morris Tp. v. LF Assocs. and Tru Urban Renewal Corp. v. City of Newark, the statutory provision that a tax exemption “shall be claimed and allowed in the same or similar manner as in the case of other real property exemptions” permits tax appeals of Fox-Lance Law exemptions in the same manner as appeals of other exemptions such as those granted under N.J.S.A. 54:4-3.6. See also, B.P.U.M. Dev. and Urban Renewal Corp. v. City of Camden, 9 N.J.Tax 490 (Tax 1988), aff'd o.b., 11 N.J.Tax 95 (N.J.Super.App.Div.1989), where the court applied general tax appeal law and principles to a claim for tax exemption under the Fox-Lance Law. All of these decisions precede enactment in 1992 of the Long Term Law, where the Legislature retained the clause “shall be claimed and allowed in the same or similar manner as in the case of other real property exemptions.” N.J.S.A. 40A:20-12. This legislative action reflects acceptance of the court interpretations of the clause. See Cavuoti v. New Jersey Transit Corp., 161 *419 N.J. 107, 133, 735 A.2d 548 (1999) (stating that “when a statute has been judicially construed, the failure of the Legislature subsequently to act is evidence of legislative acquiescence in the construction given to the statute.”) (citations omitted).
In the TPI Decision, after recognizing the applicability of general tax appeal principles to Fox-Lance Law and Long Term Law exemptions, I stated that: “Laches and estoppel are not normally applicable to the appeals process, even to appeals challenging an exemption which has been in effect for a period of years.” TPI Decision, supra at 29. I then proceeded to treat the subject appeals in a manner different from other tax appeals and held that the appeals could be subject to laches and estoppel, both of which are equitable doctrines. However, if an appeal of a Fox-Lance Law or Long Term Law exemption is subject to the same time limits, legal principles, and statutory provisions as are applicable to appeals of exemptions granted under other statutes, such as N.J.S.A. 54:4-3.6, and laches and estoppel are not applicable to those appeals, then, as a matter of legal and logical consistency, the doctrines should not be applicable to an appeal of a Fox-Lance Law or Long Term Law exemption.
The policy considerations in favor of redevelopment of blighted areas which I discussed in the TPI Decision are significant, but, as also discussed in the TPI Decision, so are the policy considerations in favor of requiring each taxpayer to pay its fair share of the tax burden, resulting in strict construction of exemption statutes. See B.P.U.M., supra at 504. The strength of the policy considerations relating to exemptions is evidenced by the holding in Morris Tp. v. LF Assocs., supra, 10 N.J. Tax at 249. There, the court invalidated an exemption granted under companion legislation to the Fox-Lance Law, even though the taxpayer and a substantial tenant of the project, specifically in reliance on the exemption, entered into a renewal lease agreement with a rent 20% below the rent under the initial lease. Id. at 245.
The analysis in the TPI Decision gave insufficient weight to the public policy requiring strict construction of exemption statutes and gave undue weight to the public policy favoring redevelop *420 ment of blighted areas. The two public policies should be regarded as in equipoise. The analysis also gave insufficient weight to the impact on the public interest of plaintiffs challenges to exemptions granted by Jersey City. I stated as follows in the TPI Decision:
If plaintiff is successful on the merits, the share of the Hudson County tax burden borne by each municipality in the county, other than Jersey City, will be reduced. In a very real sense, therefore, plaintiff seeks to enforce rights of all taxpayers in the county other than Jersey City taxpayers. Under these circumstances, the court should hesitate to apply laches or estoppel, see Garrou v. Teaneck Tryon Co., 11 N.J. 294, 307, 94 A.2d 332 (1953), even though application of either doctrine to plaintiffs appeals will not prejudice any essential governmental functions.
[Id. at 27.]
The public interest in and public importance of an issue were recognized as reasons for not applying laches in Hudson County Nat’l Bank v. Provident Inst. for Sav., 80 N.J.Super. 339, 193 A.2d 697 (Ch.Div.1963), aff'd, 44 N.J. 282, 208 A.2d 409 (1965). There, the court refused to consider a defense of laches to the plaintiffs efforts to prevent the defendant and other mutual savings banks from offering checking accounts. The court stated that “the public importance of the case disposes of defendants’ contention that plaintiff is barred by laches.” Id. at 360, 193 A.2d 697 (citation omitted).
In the related context of issue preclusion, our courts have refused to apply res judicata or the entire controversy doctrine to bar claims of public importance. For example, in Garvey v. Wall Tp., 303 N.J.Super. 93, 696 A.2d 71 (App.Div.1997), where the plaintiff sought to enjoin the defendant from providing free water to municipal buildings, the court described the claim as “not a private matter solely of interest to [the] plaintiff, but rather an issue of general public importance to which claim preclusion doctrines ordinarily do not apply.” Id. at 103, 696 A.2d 71 (citations omitted). In Parisi v. North Bergen Mun. Port Auth., 105 N.J. 25, 519 A.2d 327 (1987), the plaintiff challenged the defendant Authority’s approval of a high-rise condominium. The Supreme Court refused to apply issue preclusion doctrines, noting that “when the plaintiff represents a larger group — especially when the representation is implicit ... rather than explicit, as it is *421 in class action suits ... — -applying res judicata may unjustifiably and unjustly work against public interests.” Id. at 32-33, 519 A.2d 327. The Restatement of Judgments provides that issue preclusion doctrines do not apply when the determination of an issue could have an “adverse impact ... on the public interest or the interests of persons not themselves parties in the initial action.” Restatement (Second) of Judgments § 28(5)(1980).
Here, plaintiff implicitly represents the interests of all Hudson County taxpayers except those in Jersey City. The claims asserted by plaintiff directly affect the interests of the non-Jersey City taxpayers. Therefore, this action and the related actions filed by plaintiff (see footnote 3 above) involve matters of public interest and importance.
Under the foregoing circumstances, the applicability of laches and estoppel to plaintiffs appeals should be determined based on policy considerations relating to tax appeals. The right of appeal is constitutionally protected. “Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause.” McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, 496 U.S. 18, 36, 110 S.Ct. 2238, 2250, 110 L.Ed.2d 17, 35-36 (1990). This constitutional principle is applicable to plaintiff because plaintiff is seeking to protect its citizens against an excessive county tax share. The right of appeal gives a taxpayer or municipality the ability to ensure the propriety of governmental action in imposing tax assessments and in granting or denying exemptions. That a court should hesitate to restrict this “check” on governmental action is reflected in decisions interpreting expansively the term “taxpayer” in N.J.S.A. 54:3-21. See, e.g., Village Supermarkets, Inc. v. West Orange Tp., 106 N.J. 628, 525 A.2d 323 (1987) (permitting certain shopping center tenants to appeal); Chemical Bank N.J., N.A. v. City of Absecon, 13 N.J.Tax 1 (Tax 1992) (permitting a mortgagee that paid property taxes to appeal).
Based on the preceding discussion, I conclude that, as a matter of law, the doctrines of laches and estoppel do not apply to timely *422 tax appeals challenging Fox-Lance Law or Long Term Law exemptions. I am cognizant of the contentions by defendants that the Project was constructed, financed and leased in reliance on the tax exemption granted by Jersey City and that permitting a challenge to the financial plan years after completion of the Project is unfair, a deterrent to urban renewal projects, and a threat to the viability of the Project and other projects. These contentions are insufficient to warrant or justify the applicability of laches or estoppel to plaintiffs appeals or other appeals challenging Fox-Lance Law or Long Term Law exemptions for the following reasons: 1) plaintiff could and should have guarded against, and any other urban renewal entity can and should guard against, the loss of its exemption by careful compliance with the requirements of the applicable statutes; 2) to the extent those requirements are unclear, a court can and should (as I have done here) prevent unfairness to the entity by prospective application of clarifying, first-time statutory interpretations, or by affording the parties an opportunity to cure deviations from the statutory requirements; and 3) minor or immaterial deviations from the statutory requirements should not constitute a basis for denial of an exemption. [1]
In any event, material non-compliance with the requirements of the Fox-Lance Law or Long Term Law should not be shielded by means of a unique application of laches or estoppel to appeals of exemptions granted under these Laws. A tax exemption under N.J.S.A 54:4-3.6 has no such protection, even if the exemption has been in effect for many years. See City of Ventnor City v. Interdenominational Foreign Missionary Soc’y of N.J., Inc., 13 N.J.Tax 445, 452-53 (Tax 1993), aff'd, 15 N.J.Tax 160 (N.J.Super.App.Div.1994) (rejecting the contention that exempt status from 1922 through 1990 bound the municipality to continue the exemption in 1991). A property granted an exemption under the Fox-Lance Law or Long Term Law, “in the same or similar manner as in the case of other real property exemptions,” should receive no greater protection. Provisions in either Law relating to the duration of the exemption, e.g., N.J.S.A. 40:55C-65 and—67 *423 and N.J.S.A. 40A:20-12 and -13, do not preclude tax appeals challenging qualification for exemption for particular years.
Municipal governments have an obligation to “act solely in the public interest” and to “turn square corners” in dealing with the public. F.M.C. Stores Co. v. Morris Plains Bor., 100 N.J. 418, 426, 495 A.2d 1313 (1985) (citation omitted). That general obligation includes a specific obligation to grant tax exemptions only in strict compliance with applicable law so that the rights and interests of the citizens of the municipality, and others affected by its actions, are not improperly prejudiced. The Legislature has empowered taxpayers and taxing districts to appeal assessments in the county in which they are located. N.J.S.A. 54:3-21. This ability to remedy improper governmental action and enforce the “square corners” doctrine is as important with respect to Fox-Lance Law and Long Term Law exemptions as it is with respect to other exemptions. Plaintiff and its citizens have been affected by the actions of Jersey City in granting a tax exemption to the Project. In appealing the exemption for 1998 and 1999, plaintiff exercised express statutory rights. The doctrines of laches and estoppel, which are not applicable to other tax appeals, should not be applied here to defeat those rights.
VIII.
Conclusion
Based on the analysis and conclusions set forth above, defendants’ motion for summary judgment is granted, and plaintiffs motion for summary judgment is denied with respect to the following issues: the amount of the annual service charge, the requirements for additional payments, and failure to comply with the certification requirements of the applicable statutes. As to the issues relating to transfer of the Project and computation of excess profits, if, within sixty days from the date of this decision, Jersey City ratifies the transfer, and the required excess profit payment, if any, is made, then defendants’ motion for summary judgment as to these issues will be granted and plaintiffs motion *424 denied. If, however, within the sixty day period, either Jersey City does not ratify the transfer or any required excess profit payment is not made, then I will grant plaintiffs motion for summary judgment as to the applicable issue and deny defendant’s motion. Entry of an Order will be deferred as to all issues pending the expiration of the sixty day period.
*425 ATTACHMENT
[[Image here]]
*426 [[Image here]]

 Plaintiff does not concede that Linpro-Colgate I and Linpro-CP are the same entity. For purposes of ruling of the motions before me, I will assume, without deciding, that only a name change occurred.

 In the TPI Decision, supra, 19 N.J.Tax at 36-39, I explained the certification procedure contemplated by this language and, in the Supplemental TPI Decision, *411 supra, 19 N.J.Tax 538, I held that my statutory interpretation had prospective application and did not apply to tax years 1998 and 1999, the years at issue in that matter. These rulings are not relevant to the impact of the certification requirement in the context of this Section of this Opinion.

 One aspect of the legislative history of the Long Term Law was a proposed amendment to N.J.S.A. 40A:20-12b(l) which provided that the annual service charge for projects such as the Project “shall not be ... less than 2% [of total project cost].’' This language was deleted before enactment of the Long Term Law and the phrase “shall be 2% [of total project cost]’’ was substituted. See TPI Decision at 35.

 Plaintiff has filed a series of appeals challenging tax exemptions granted by Jersey City to urban renewal projects under the Fox-Lance Law, the Long Term Law, and other statutes. I alerted counsel in this matter and in the other pending appeals that I was reconsidering my rulings as to laches and estoppel. I invited and received additional briefs on the issue and heard additional oral argument. Counsel for the following defendants in the other appeals filed briefs, presented oral argument, or both: BBV U.S. Real Estate Fund III, L.P.; Cali Harborside Assoc., L.P.; Cal-Harbor II & III Urban Renewal Associates, L.P.; Newport Associates Development Company; Trizec Holdings, LLC; 90 Hudson Street L.L.C.; Hud. Hosp. Serv. U.R. Hartz Mountain; Panepinto-Hartz-Mangan J.V.; Claremont U.R. Corp.; Battery View Senior Citizens Housing, Ltd.; Summit Plaza Associates; and Kennedy Boulevard Associates. Counsel for the Township North Bergen and the City of Bayonne also appeared at oral argument. One argument advanced by some defendants in the reconsideration proceedings was that, in the TPI Decision, I improperly allocated to defendants the burden of establishing plaintiff's knowledge of facts relating to adoption of the ordinance approving a tax exemption for TPI’s project and authorizing the financial agreement between Jersey City and TPI. I need not address this argument.